[Civ. No. 26811. Second Dist., Div. One. May 2, 1963.]

WALTER E. WHITE, Plaintiff and Appellant, v. ELDON M. MARTIN et al., Defendants and Respondents.

Walter E. White, in pro. per., for Plaintiff and Appellant.

J. Paul Madsen as Amicus Curiae on behalf of Plaintiff and Appellant.

Harold W. Kennedy, County Counsel, and Irvin Taplin, Jr., Deputy County Counsel, for Defendants and Respondents.

LILLIE, J.—Plaintiff sued defendants, sheriff's deputies, for false arrest and imprisonment alleging wrongful arrest without a warrant on suspicion of burglary; defendants claim they had probable cause to arrest plaintiff. The matter was heard before a jury; at the end of plaintiff's case the lower court granted defendants' motion for nonsuit. Appeal is from the order.

While plaintiff has seen fit to include in the record before us only a reporter's partial transcript, it is apparent that it and the exhibits reflect substantially all of the evidence received at the trial; moreover, appellant has not pointed out wherein any of his testimony not before us creates a factual conflict on the issue of probable cause. Plaintiff's case consists of his own testimony, a tape recording made (unknown to defendants) by plaintiff of all conversation between him and defendants leading up to his arrest (pl.'s ex. 4), and the testimony of both defendants under section 2055, Code of Civil Procedure. Careful consideration of the transcript, the exhibits and tape recording (which we have heard) reveals no substantial conflict in the evidence relative to probable cause. Defendants' testimony of their conduct, knowledge and beliefs and the circumstances at the time of their entry on plaintiff's premises stands uncontradicted; and nowhere in plaintiff's testimony or the tape recording is there any substantial conflict with defendants' testimony concerning what occurred on the premises just prior to and at the time of plaintiff's arrest. Thus, here controlling is the rule that "Where the evidence material to the issue of probable cause is without substantial conflict, it is a question of law for the court to decide whether there was probable cause for arrest. (*Coverstone* v. *Davies*, 38 Cal.2d 315 [239 P.2d 876]; *Collyer* v. *S. H. Kress & Co.*, 5 Cal.2d 175 [54 P.2d 20]; *Gibson* v. *J. C. Penney Co., Inc.*, 165 Cal.App.2d 640 [331 P.2d 1057].)" (*Cole* v. *Johnson*, 197 Cal.App.2d 788, 793 [17 Cal.Rptr. 664].) Therefore, inasmuch as probable cause constitutes a good and proper defense in a case of this kind (*Collyer* v. *S. H. Kress & Co.*, 5 Cal.2d 175 [54 P.2d 20]) and the existence of probable cause is herein a question of law (*Aitken* v. *White*, 93 Cal.App.2d 134 [208 P.2d 788]), it must be conceded that if the evidence demonstrates probable cause for plaintiff's arrest, nonsuit was properly granted.

Viewing the evidence in a light most favorable to plaintiff (*Cole* v. *Johnson*, 197 Cal.App.2d 788 [17 Cal.Rptr. 664]), " 'giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence' " (*Estate of Lances*, 216 Cal. 397, 400 [14 P.2d 768]; *Coates* v. *Chinn*, 51 Cal.2d 304 [332 P.2d 289]; *Raber* v. *Tumin*, 36 Cal.2d 654 [226 P.2d 574]), and in accord with the rules relating to nonsuits, we summarize the plaintiff's case.

Defendants Harre and Martin are deputy sheriffs working out of the Norwalk substation. Prior to May 27, 1960, neither deputy knew plaintiff or recalled ever having seen, contacted, or heard of him. While Harre had, three weeks previously, issued a routine traffic citation to plaintiff (pl.'s ex. 8) and remembered looking in the automobile "for containment of the vehicle" and seeing a male form, he neither saw nor talked with plaintiff nor had any personal contact with him; his then partner, Deputy Omohundro, walked up to the driver's side of the vehicle and talked with plaintiff but Harre remained at the right rear of the radio car where he wrote the citation, recording thereon plaintiff's name, physical description and address from plaintiff's driver's license and other information brought back to him by Omohundro; and although on May 27 a subpoena for Harre's appearance in the Downey Municipal Court in plaintiff's traffic case lay in his box at the sheriff's station, in the early morning of that day when plaintiff was arrested Harre was unaware of the subpoena, that he had been subpoenaed, or that plaintiff was the same as the person for whom he had written the citation on May 2 (he did not discover this until later in the morning of May 27 after plaintiff's arrest). Martin, not having been with Harre and Omohundro on May 2, had never seen or heard of plaintiff.

Around midnight on May 27, 1960, Harre and Martin started on general routine patrol in a sheriff's radio patrol car in the area of Orange and San Antonio Drive in Norwalk. The night was clear and warm. Between 4 and 5 a.m., as they passed a dark office located at 14009 San Antonio Drive, both "simultaneously" observed through a window facing San Antonio Drive "a flare of light from within," described by both as "characteristic" of, and as if "a match was being struck." It was a light, not a flicker; it went out almost immediately. Both deputies knew from official reports and a crime pin map on the wall at the station that for some months prior, the

reporting district in which 14009 San Antonio Drive is located, consisting of 1/6 of the City of Norwalk, had the greatest number of burglaries of any reporting district in the entire patrol area. The deputies, while familiar with the area which was combined business and residential, did not know to whom the office at 14009 San Antonio Drive belonged nor had they ever before stopped at that address; it was in fact an insurance office (pl.'s ex. 1) and the front of the premises bore the word "Insurance" in large lettering.

Faced with the foregoing, the deputies stopped "to check the building" and "for the purpose of investigation." Martin backed up and parked in front; although other vehicles were parked in the vicinity, neither deputy noticed any particular automobile. Harre ran to the front of the building and Martin started around the north side to the rear. Harre approached the front window out of which he had observed the flare of light; it was dark inside, but upon seeing movement of a figure cross the window he looked in through the venetian blind. He saw nothing, but immediately a "blinding flash of light" from within burst "right in his face" causing him temporary blindness. "Startled" and not knowing what it was, he "instinctively" reached for the door and turned the handle; it opened, but he heard nothing. As he stepped inside a light suddenly went on and plaintiff was standing to the right of the door with his hand on the knob; plaintiff had turned on the light. He also had opened the door but neither deputy knew this. Plaintiff wore a sport shirt, slacks, shoes and a camera on a strap slung over his shoulder.

Meanwhile, Martin, midway to the rear, saw the light flash in Harre's face; he ran to the front and as he passed a window saw a light come on inside and plaintiff standing with his left hand on the light switch and his right hand on the door knob. Neither deputy had "any idea" what the flash of light was. Plaintiff had heard a noise, looked out the window, saw a face and took a picture of Harre's face at the window with his camera; he at no time told the deputies what he had done and, when asked by them what the flash was, retorted, "That is my business." The deputies did not connect the flash of light with a photograph, nor did they know what it was.

By the time Martin got to the front, the door was open and Harre was asking plaintiff what he was doing "in this office at this hour of the morning," and for his identifica-

tion. He refused to identify himself but mentioned, without explanation, that he had run a tape and shown some movies; they noticed a screen in the room after they entered but at no time either heard or saw a film being run; and while certain photographs (pl.'s exs. 2, 3) reveal various electrical equipment scattered about the room enclosed in a cabinet, on the floor, on a table, et cetera, the deputies neither recalled seeing a projector or recorder nor recognized any of the equipment as such. Harre heard some noise in the background which might have been a radio. Plaintiff refused to give them any identification. All testimony and the photographs in evidence disclose the premises to be an office; it was untidy and papers were strewn around. While Harre and Martin talked to him, plaintiff "confined himself to the immediate area" and did not move around much although after talking with him a few minutes they saw him plug in some sort of an apparatus and put a microphone on a table, but at that time they failed to recognize any object as a tape recorder and did not realize that the conversation was being taped. He, in fact, turned on his recorder and taped the entire conversation from then on between himself and the deputies (pl.'s ex. 4). While they noticed some wheels "moving" they paid no attention to them and neither deputy knew that the conversation was being recorded.

Ten or twelve separate times the deputies asked plaintiff for identification, but at no time did he ever tell them his name or give them anything to establish his identity, although at all times he had on his person a wallet containing his driver's license. Plaintiff appeared to be "very apprehensive and very nervous," he "seemed to be anticipating something, he was very fidgety, looking around the room" and "was unsettled for some reason." The deputies, during the entire time, knew neither plaintiff's identity, to whom the office belonged, nor his business there. About these matters they repeatedly questioned plaintiff; at one phase he refused to answer their questions and when he did, there was "quite a delay" and "he seemed quite nervous." After having been asked for his identification and what he was doing there, plaintiff said, "What's the trouble," but when again asked to identify himself he responded only by reciting "2388" and "293," badge numbers of the deputies. At one point plaintiff informed them he didn't have to show identification, but when the deputies told him they didn't know who he was he answered, "What if I don't choose to show it in my own

house?"; they replied: "We don't know this is your house." Plaintiff claimed it was, but inasmuch as the premises appeared to be an office the deputies asked if they could look through it; plaintiff answered, "No, you cannot." One of the deputies told him, "I[t] looks like an office to me"; and, that if he could prove he lived there, they would be glad to be on their way. Repeatedly asked to show identification, plaintiff answered variously: "I live here" (without further explanation and without permitting deputies to look around), "Call Sergeant Fox," "I have a card" (he at no time offered it to the deputies and they later told him it would not be sufficient identification), "I don't like people sticking their faces in windows," "I suggest you call Sergeant Fox," and "This is not a police state, we are not required to carry passes," but he at no time gave his name or produced any identification. The deputies again explained that they did not know who he was or that it was his house and "you may be burglarizing for all we know," to which plaintiff retorted, "Then you'll get a report tomorrow morning." Several times they told him: "If you would show us who you are," or if you would prove you live here" "we would be glad to be on our way." Inasmuch as the premises constituted an office, the deputies continued their inquiry. Once when they told plaintiff he was required, under the circumstances, to produce identification he took issue with them and said: "Oh, no, there is no law," and began "conversing rather loudly." Finally having no idea who he was, to whom the office belonged or his business there at that hour of the morning, having repeatedly asked plaintiff for identification and been refused, and finding no plausible reason why he would not identify himself, the deputies began to think of him as "a possible burglar" and advised him that in view of the high burglary rate in the area, if he would not identify himself and if they could not establish his legal business there, they would have no alternative but to arrest him on suspicion of burglary and take him to the station for further questioning. Four or five times plaintiff told them to call Sergeant Fox at the station and that he knew "quite a few" people in the sheriff's department, but when they tried to use the telephone to verify his identity, plaintiff refused and said, "You have a radio in your car." They did not use their radio because Fox was not then on duty, it was 4 o'clock in the morning, and they maintained no radio communication with personnel residences. The deputies had no knowledge of plain-

tiff or any relations he may have had with the sheriff's department, or that he had ever talked to Fox or anyone else at the station. At one point when plaintiff told them he didn't like people sticking their faces in windows, the deputies patiently informed him that they "do protect the city" and it was their job to check business offices and when they saw someone lurking in the shadows at that hour in the morning they investigated. Finally, unable to ascertain plaintiff's identity or his business there, they told him they would have to arrest him, and did so. Just before putting the handcuffs on him, they gave him "a quick pat for weapons" and as they handcuffed him he offered some resistance, lunging forward "a furtive movement, a step forward" away, while Harre held the handcuffs, saying something about turning off a tape recorder and securing the premises. Harre told him, "We don't know this is your house." However, Martin "pulled the wall plug that seemed to hold all the cords in the room" and locked the door; they walked him out to the car. Plaintiff did not ask why he was being arrested. While there are in the record before us several unexplained and unidentified photographs (pl.'s exs. 5, 6, 7) of what appears to be a sore on an arm (which we assume to be plaintiff's), the deputies testified they did not hurt plaintiff or tighten the manacles and left room for a finger between plaintiff's wrist and the edge of the handcuff; nor did plaintiff complain about them. When they arrived at the station the cuffs were removed and plaintiff's property was taken from him and placed in the booking cage. The deputies related the incident to Sergeant Hagen, the watch sergeant, and explained plaintiff's refusal to identify himself. Hagen went to the cage, took plaintiff's driver's license from his wallet and asked him if he was Walter E. White. Plaintiff answered, "Yes"; he then asked him if he lived at 14009 San Antonio Drive, but plaintiff remained silent. Hagen told plaintiff that when a police officer asks for identification, "if you do not have any reason for not telling your name, it is just as easy to give them the identification, save yourself the inconveniences afforded you"; plaintiff said nothing. However, satisfied from his papers that he lived at that location, the sergeant instructed the deputies to return plaintiff to the premises. On the way back Harre told plaintiff he was sorry for the inconvenience, but that it was necessary to arrest him because of his refusal to identify himself. Plaintiff was never booked or interrogated about any particular crime. He was at the sta-

tion for no longer than 10 or 15 minutes during which time he seemed to be "quite nervous." When they arrived at the office, plaintiff informed them he was locked out; Martin gained entry and admitted him to the premises.

The tape (pl.'s ex. 4) recorded the entire conversation between plaintiff and the deputies. In addition to the 10 or 12 times they asked plaintiff for identification and plaintiff's repeated refusal to identify himself and explain his presence there, the tape reveals an evasive, arrogant and uncooperative attitude on his part; on the other hand it establishes the patience, restraint and courtesy with which the deputies treated him and that several times they actually begged him to identify himself so they could be on their way.

We conclude from the evidence before us, as did the lower court, that the deputies, when they arrested plaintiff, were presented with such a set of circumstances as would lead an ordinary man of care and prudence to believe and to conscientiously entertain a strong suspicion, even though there may have been some room for doubt, that plaintiff was in the process of committing a burglary. Concerning their beliefs and state of mind at that time, Deputy Martin testified that the possibility that plaintiff was burglarizing "this place" entered their minds and the reason he was arrested was because they could not ascertain his legal business in that location, he refused to identify himself, they had no idea to whom the office belonged and at that hour of the morning they had "no other course of action." He further testified that they arrested plaintiff because they "thought he was a possible burglar, because he refused to identify himself," and that it was their opinion that he was a possible burglary suspect based on their uncertainty that he even belonged in the area, he was on the premises, he would not identify himself as belonging there, and "any one that was in there and did not belong would be a burglary suspect." Deputy Harre, when first asked when after he opened the door he was convinced he had a "possible burglary suspect," testified he "never really was convinced." He said he was trying "to ascertain that point" by asking plaintiff to produce identification; he further stated that while on the premisies it "did run through" his mind that plaintiff was a possible burglary suspect but it was not conclusive for they were still trying to identify him; that after repeatedly asking plaintiff for identification he "could find no plausible reason why the man would not identify himself, and on this premise" he began "think-

ing along those lines'' that plaintiff was a ''possible burglar'';
finally, that ''after asking him repeatedly for identification
and for the use of the phone so we could get identification
at the station, and his constant refusal . . . toward . . .
the end . . . ,'' he came to the conclusion plaintiff was a pos-
sible burglar; and that at the time he put handcuffs on him
he ''thought'' he had ''reasonable cause to believe'' plaintiff
was a possible burglary suspect.

 Inasmuch as the deputies had no warrant, their au-
thority to arrest plaintiff is derived from section 836, Penal
Code. Thus, if defendants had reasonable cause to believe
plaintiff had committed a public offense in their presence
(§ 836, subd. 1), or had committed a felony, whether or not a
felony had in fact been committed (§ 836, subd. 3), they were
justified in arresting him.

 There being no formula for its determination, what
constitutes ''reasonable cause'' depends upon the facts and
circumstances of each case (*Go-Bart Importing Co.* v. *United
States,* 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374]; *People* v.
*Ingle,* 53 Cal.2d 407 [2 Cal.Rptr. 14, 348 P.2d 577])—the
situation presented or apparent to the officers at the time they
were required to act. (*People* v. *Evans,* 175 Cal.App.2d 274
[345 P.2d 947]; *People* v. *Silvestri,* 150 Cal.App.2d 114 [309
P.2d 871]; *People* v. *Carella,* 191 Cal.App.2d 115 [12 Cal.
Rptr. 446]; *People* v. *Kilvington,* 104 Cal. 86 [37 P. 799,
43 Am.St.Rep. 73].) ''Reasonable cause has been de-
fined by our California Supreme Court as such a state of facts
as would lead a man of ordinary care and prudence to believe,
or entertain an honest, strong suspicion, that the person in
question is guilty of a crime. (*People* v. *Kilvington,* 104 Cal.
86 [37 P. 799, 43 Am.St.Rep. 73].)'' (*People* v. *West,* 144 Cal.
App.2d 214, 219 [300 P.2d 729].) Probable cause is a
suspicion founded upon circumstances sufficiently strong to
warrant a reasonable man in the belief that the charge is true.
(*People* v. *Brite,* 9 Cal.2d 666 [72 P.2d 122]; *Bompensiero* v.
*Superior Court,* 44 Cal.2d 178 [281 P.2d 250].) The
court in *People* v. *Ingle,* 53 Cal.2d 407 [2 Cal.Rptr. 14, 348
P.2d 577], further defines it ''. . . as having more evidence
for than against; supported by evidence which inclines the
mind to believe, but leaves some room for doubt. (*People* v.
*Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344]; *People* v. *Novell,*
54 Cal.App.2d 621, 623-624 [139 P.2d 453]; *Ex parte
Heacock,* 8 Cal.App. 420, 421 [97 P. 77].)'' (p. 413);
 and again at page 414: ''Unless it can be said that

prudent men in the position of these officers knowing what they knew and seeing what they did would not have had reasonable cause to believe and to conscientiously entertain a strong suspicion that Ingle was violating or had violated the law, the arrest should be held lawful.''

Thus, the existence of probable cause is ''to be decided in accordance with the circumstances at the time of the detention, unhampered by the outcome of the charge against the plaintiff of the public offense or by the conclusions of the trial court. [Citations.]'' (*Collyer* v. *S. H. Kress & Co.*, 5 Cal.2d 175, 181 [54 P.2d 20].) Keeping in mind this rule, we are of the opinion that the deputies had probable cause to arrest plaintiff. They were highly suspicious circumstances that confronted the deputies at that time. Ordinarily one does not stand around alone in a dark office full of expensive electrical apparatus at 4:30 in the morning with a camera slung over his shoulder and, to proper questions put by officers, refuse to identify himself or explain his business there. Defendants, experienced law enforcement officers, knew of the high burglary rate in that area; it was between 4 and 5 o'clock in the morning, a time when persons seldom have legitimate business in an office, when they saw what they thought to be a match being struck; suspicious, they stopped to investigate and did so in the regular routine manner of all law enforcement officers; one deputy, who saw a figure move inside was met with a sudden blinding flash of light when he looked in the window, presenting a most unusual situation; not knowing what the flash was the deputies entered the premises which constituted not a home but a business office in which there appeared to be expensive electrical equipment; plaintiff was dressed in shirt, slacks and shoes, not unusual for outdoors on a warm night, and wore a camera over his shoulder, more than usual for one moving about in his own home; the office was untidy and papers were strewn around and plaintiff appeared to be nervous, fidgety and apprehensive and kept looking about the room; in response to what he was doing there at that time of the morning, plaintiff said he had run a movie and tape, but while the officers noticed a screen, no film was being run and they recalled seeing no projector or recorder, and plaintiff offered no further explanation; they asked plaintiff 10 or 12 separate times for his identification, explaining that there had been numerous burglaries in that area, they did not know who he was or his business there or to whom the office belonged, and that identi-

fication was necessary, but at no time did he tell them his name or show them any identification, although at all times he had a driver's license on his person; in response to proper questions by the officers plaintiff was alternately silent, evasive, discourteous and hostile; he claimed to live there but would not further explain and would not permit the deputies to look around, and it was apparent that the premises constituted an office and the circumstances were not conducive to a reasonable conclusion that he lived on the premises or had legitimate business there; questioned by the deputies about the flash of light, plaintiff only answered, "That is my business" and at one point retorted, "This is not a police state, we are not required to carry passes"; while he mentioned a card he never offered it to the deputies; he repeatedly told them to call Sergeant Fox but when they wanted to, he prevented their use of the telephone; they finally warned him if he did not establish his identity and show his legitimate business there they would have to take him to the station for further questioning, giving him every possible opportunity to identify himself and avoid being taken into custody. This combination of circumstances led the deputies to believe, and properly so, that plaintiff was in the act of burglarizing the premises; his arrest was lawful.

 At the outset the deputies were completely justified in stopping to "check" or "investigate" when they saw a flare of light on the premises; they had a right, indeed a duty, to determine if anyone was in the office at that hour of the morning and if so, what he was doing there. And during such investigation, especially at night, there is nothing unreasonable or improper in the deputies making further inquiry and entering the premises (*People* v. *Contreras*, 211 Cal.App. 2d 641 [27 Cal.Rptr. 619]) and seeking an interview with a suspect or questioning him (*People* v. *Zavaleta*, 182 Cal.App. 2d 422 [6 Cal.Rptr. 166]; *People* v. *Davis*, 188 Cal.App.2d 718 [10 Cal.Rptr. 610]; *People* v. *Jaurequi*, 142 Cal.App.2d 555 [298 P.2d 896]; *People* v. *West*, 144 Cal.App.2d 214 [300 P.2d 729]), even in his own home (*People* v. *Michael*, 45 Cal.2d 751 [290 P.2d 852]; *People* v. *Burke*, 47 Cal.2d 45 [301 P.2d 241]; *People* v. *Sanchez*, 191 Cal.App.2d 783 [12 Cal.Rptr. 906]); and when, as here, response to reasonable inquiry elicits evidence that would lead the deputies to believe he may be committing or has committed a burglary, especially where they had reports of numerous burglaries in the area, their conduct is not unreasonable. (*People* v. *Simon*,

45 Cal.2d 645 [290 P.2d 531]; *People* v. *Blodgett,* 46 Cal.2d 114 [293 P.2d 57]; *People* v. *Martin,* 46 Cal.2d 106 [293 P.2d 52]; *People* v. *West,* 144 Cal.App.2d 214 [300 P.2d 729].) Plaintiff's arrogant and uncooperative attitude, his apparent nervousness and apprehensiveness, his failure to give any plausible explanation of his business there and his refusal to identify himself, were sufficient to accelerate the deputies' original suspicion that plaintiff's presence there was not that of an honest, law-abiding citizen engaged in lawful business. His conduct placed the deputies in the position of either releasing on the spot one suspected of being a burglar to continue his illegal activities unhampered, well rid of a difficult situation, or arresting him thereby securing the premises from assault and subjecting themselves to possible false arrest charges. As law enforcement officers, faithful to the performance of their duties to maintain law and order, they chose the latter course.

Appellant's critical appraisal of the deputies and his defense of his own conduct and attitude show slight appreciation of the duties and responsibilities the deputies, as guardians of the peace and security of the community, have to properly and effectively protect persons and property in the area from assaults in the night, and the dangers and difficulties that beset them in maintaining law and order and preventing the commission of crime. "It is for the performance of these duties that police officers are commissioned and paid by the community. . . ." (*Christal* v. *Police Commission,* 33 Cal. App.2d 564, 567 [92 P.2d 416].) Plaintiff's conduct and attitude not only seriously hampered the deputies in the reasonable performance of their duties, but actually created much of the circumstances that led them, as reasonable persons, to believe that he was on the premises with intent to commit theft or other felony. (Pen. Code, §§ 459, 460.) Had he supplied the deputies with his driver's license then on his person, he could have avoided the entire episode.

While a business card was once briefly mentioned by plaintiff, although never offered to the deputies, for obvious reasons it would not have constituted sufficient identification; nor need officers unqualifiedly accept a suspect's bare statement, "I live here," particularly when the premises constitute an office, otherwise every investigation of one found in the act of burglarizing premises would be defeated simply by such a statement. Why plaintiff refused to identify himself does not appear in the record before us. If he was under a miscon-

ception of his legal rights and duties, or if he believed that he was the subject of a "roust" by the sheriff's department, this can hardly be material here, for it is uncontradicted that prior to May 27 the deputies neither knew nor heard of plaintiff, anything about his activities, or any relations he may have had with the sheriff's station; and it is what is apparent to the officers and their knowledge and belief that is material in the determination of the existence of probable cause, not what was secretly in the mind of the person arrested. The evidence shows that the deputies' investigation, interrogation and arrest of plaintiff were no more than routine, and done in the regular performance of their duties as law enforcement officers.

Nor does the record show that the physical aspect of either plaintiff's arrest or detention was unreasonable. The deputies were courteous and restrained in their conduct toward plaintiff; they took pains to explain to him that they were only doing their "job" and would have to take him to the station if he would not identify himself and, he still refusing to do so, then told him why they were arresting him. The officers acted with propriety; they were polite and courteous and used no loud, angry or obscene language, or force or violence. Several photographs show a sore on an arm (which we assume to be plaintiff's) but the record is silent concerning them; the record also fails to show that the deputies hurt plaintiff, in fact, to the contrary, reveals that they did not tighten the manacles and left room for a finger between plaintiff's arm and the edge of the handcuff and that he at no time complained of the handcuffs or how they were put on. The evidence discloses that when they put the handcuffs on plaintiff he lunged forward away from them; the only reasonable conclusion we can reach from the state of the record is that then the abrasion occurred. Plaintiff was in the station no more than 15 minutes and then released; the deputies drove him home, Harre apologized for the inconvenience, and Martin gained entrance to the locked premises to admit plaintiff. Under the circumstances we can only conclude that plaintiff was treated with courtesy and consideration.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied May 24, 1963, and appellant's petition for a hearing by the Supreme Court was denied June 26, 1963.