STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
VINCENT ZITO, DEFENDANT-APPELLANT.

Argued April 22, 1969—Decided June 26, 1969.

208

*Mrs. Miriam N. Span,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Robert H. Altshuler,* Assistant Prosecutor, argued the cause for respondent (*Mr. John G. Thevos,* Passaic County Prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J.   Vincent Zito, Charles Miller, and Karl Shucai were convicted of breaking and entering, *N. J. S.* 2A :94–1, and of larceny, *N. J. S.* 2A :119–2. Zito appealed.

His convictions were affirmed by the Appellate Division, 103 *N. J. Super.* 552 (1968), and we granted his petition for certification, 53 *N. J.* 347 (1969).

The case turns upon an issue of search and seizure. Zito, Miller and Shucai were in Shucai's automobile when they were arrested. A search of the trunk of the car yielded stolen property, the fruit of the crimes for which they were convicted. Zito alleges the arrests were illegal because made under an invalid statute, and therefore the search cannot be upheld as incidental to the arrests. The statute to which Zito refers is *N. J. S.* 2A :170–1, which reads:

"Any person who is apprehended and cannot give a good account of himself, or who is engaged in an illegal occupation and who is in this state for an unlawful purpose, is a disorderly person. In any prosecution under this section the fact that the person apprehended cannot give a good account of himself or is engaged in an illegal occupation is *prima facie* evidence that he is present in this state for an unlawful purpose."

I

The Appellate Division accepted the premise that the search depended upon the validity of the statute just quoted, and finding the statute sufficient, held the stolen property was correctly received in evidence. We think the evidence was correctly received even if that statute were unconstitutional, and this for two reasons.

The first is that the product of a search should not be suppressed when a search is made in good faith upon the strength of a statute later declared unconstitutional. *State v. Gerardo,* 53 *N. J.* 261 (1969). The Fourth Amendment does not bar the use of evidence obtained in violation of its terms. Suppression is a judge-made device to deter future acts of insolence in office rather than to rectify a wrong already done. It must not be overlooked that the contest is between the first right of the individual — the right to be protected from crime — and the right of the individual to be free from an unreasonable search and seizure, and that

when criminals are set loose because patent evidence of their guilt is suppressed, a heavy price is exacted, not from an abstraction called the State or the police or society, but from law-abiding individuals whose right to be protected is thereby impaired. Here there is no reason to invade the first right of the individual. Surely it is not arrogant of an officer to abide by the statutes of his State. On the contrary, it would be presumptuous of him to sit in constitutional judgment. It is therefore correct, and realistic, to say in the language of the Fourth Amendment itself that the search was not at all "unreasonable."

The second reason why the search should be upheld even if the statute here questioned were invalid is that the officers had ample cause to arrest for other offenses, and this being so, it would serve no defensible end to suppress the truth. That other grounds for arrest were known to the officers is evident in the record.

The arrests occurred at about 2:50 A.M. on October 10, 1966, across the street from a tavern. On the prior night four men had been in the tavern as patrons. Their trips to the men's room struck the owner as unusual. He examined the room after they left it and discovered the latches on the window had been tampered with. At 4:00 A.M. that morning an attempt was made to gain entry into the tavern. It failed when a burglar alarm was set off. The owner was understandably disturbed when early the next morning he recognized the occupants of the car parked across the street as three of those four men. The car having been there for some 40 or 45 minutes and the closing time being near, the tavern owner called police headquarters. The officers responded. The tavern owner related to them the facts we have just recounted, and his fear that the occupants of the car were there to rob him or burglarize his place.

The officers thereupon questioned the occupants of the car. In plain view was a 14-inch length of pipe wrapped in tape, which lay on the floor between the driver and the man who sat in the center of the front seat. The officer deemed the

pipe to be a weapon (and correctly so; Shucai testified he had it for "protection"). None of the defendants responded to the officer when asked what that object was. Learning that Zito and Miller were parolees and receiving no explanation which met the thrust of what they had heard and seen, the officers told the occupants they were under arrest. The men were searched, and a toy pistol was found in Shucai's right rear pants pocket. The trunk of the car was then searched, and in it were articles and sundry tools which had been stolen, apparently earlier that same morning, from a garage next door to the tavern. It was that burglary and larceny for which defendants were convicted.

At the time of the arrest, the officer had in mind the disorderly persons statute quoted above. We gather, however, that defendants were "booked" for the breaking and entry into the garage and the theft of the articles and tools, and this on the basis of the discovery made after the arrest.

From the foregoing it is plain the officers knew of two additional bases for an arrest. One was the carrying of the home-made weapon in the automobile. *N. J. S.* 2*A*:151–41. The arresting officer stressed that one of the facts he took into account was the presence of a weapon, *i. e.*, the pipe taped for use as a club. Surely this was sufficient for the arrest of Shucai, the owner of the car that was searched. The second basis was a conspiracy to commit larceny, robbery or burglary in violation of *N. J. S.* 2*A*:98–1. The facts revealed by the owner of the tavern, coupled with the observation of the home-made blackjack, constituted an adequate basis to believe the men were there for one of the purposes we have stated.

The question then is whether it should matter that the arresting officer selected one of the known bases of arrest rather than another, and that, hypothetically for our immediate discussion, the basis selected is later adjudged to be inadequate. There are cases involving civil actions for false arrest in which the officer has been held to the single ground he used at the time of the arrest. See *Donovan v. Guy,*

347 *Mich.* 457, 80 *N. W. 2d* 190 (*Sup. Ct.* 1956) ; *Geldon v. Finnegan,* 213 *Wis.* 539, 252 *N. W.* 369 (*Sup. Ct.* 1934) ; Annotation, 64 *A. L. R.* 653 (1929). We need not say whether we would subscribe to that view in a civil suit, for here other values are involved. As we have said, the issue is whether an adjudged criminal shall be set free at the expense of the individual's right to be protected from criminal attack. It would be a windfall to the criminal, and serve no laudable end, to suppress evidence of his guilt upon the fortuitous ground that the arresting officer, who knew of several bases for the arrest, selected one a judge later found inadequate. *Commonwealth v. Lawton,* 348 *Mass.* 129, 202 *N. E. 2d* 824, 826 (*Sup. Jud. Ct.* 1964). In terms of the Fourth Amendment, a search cannot sensibly be called "unreasonable" when ample cause existed for the arrest and was known to the arresting officer.

## II

Hence we are satisfied the arrest was lawful even if the officers erred in relying upon *N. J. S. 2A* :170–1, quoted above. But we think that statute, properly construed, is valid, and the arrest may rest upon it.

The statute is assailed upon a reading of it which would make a man's inability to give a good account an element of the offense. So read, the statute, defendant says, would deny due process of law because "good account" is too vague to forewarn a citizen with respect to what is forbidden. The further provision of the statute, that "the fact that the person apprehended cannot give a good account of himself * * * is *prima facie* evidence that he is present in this state for an unlawful purpose," is challenged too under the due-process clause, on the ground that the authorized inference does not rationally flow from the premise. Further, if a refusal to answer constitutes an element of the offense or evidence of it, these same provisions may be questioned under the self-incrimination provision of the Fifth Amendment.

In *State v. Salerno*, 27 *N. J.* 289 (1958), we pointed out that the statute sought to "nip crime in the beginning" by proscribing conduct indicative of a purpose to violate the law (*pp.* 294–295). We noted that *McNeilly v. State*, 119 *N. J. L.* 237 (*Sup. Ct.* 1937), had said the statute would be unconstitutional if a conviction could rest solely upon an inability to give a good account, and had upheld the act upon the thesis that an additional element was required, namely, that the defendant be present in the State for an unlawful purpose. *McNeilly*, however, did sustain the provision that inability to give a good account was *prima facie* evidence of presence for an unlawful purpose. We recognized in *Salerno* that the constitutional issues raised by *McNeilly's* view of the statute were "formidable" (*p.* 296), and although we found it unnecessary to deal with them, we did refuse to apply so much of *McNeilly* as held that the failure to give a good account could sustain a finding of presence for an unlawful purpose. Accordingly, despite our belief that Salerno's explanation was "incredible," we held the conviction could not stand because there was no evidence of an identifiable unlawful purpose.

Thereafter, in *United States v. Margeson*, 259 *F. Supp.* 256 (*E. D. Pa.* 1966), which involved a motion to suppress evidence seized in connection with an arrest, the District Court held our statute invalid because of the provision that a failure to give a good account is *prima facie* evidence of presence for an unlawful purpose. The District Court read *Salerno* to uphold that evidentiary provision and to have turned the case upon the fact that Salerno offered an explanation which neutralized the statutory presumption or inference (*p.* 271). As we have just said, we did not so hold in *Salerno*. On the contrary, we held that a failure to give a good account (and indeed the giving of an account that was bad) could not support a conviction. Subsequently, our Appellate Division declined to follow *Margeson*, noting correctly that in *Salerno* we reserved the constitutional is-

sue for later consideration. *State v. Speciale,* 96 *N. J. Super.* 1 (1967), *certif.* denied, 50 *N. J.* 291 (1967).

A statute such as ours seeks to head off the commission of crime. It reaches a criminal plan not yet pressed to the stage of an "attempt." Where several agree to commit a crime, as appears to be the case before us, the conspiracy statute may be invoked even though a substantive offense is not yet attempted, but when only one individual is involved, there must be another way to deal with the same threat. This is the aim of the statute, and it applies whether there are one or more. It of course does not penalize mere thought. Indeed it does not penalize acts of preparation as such, for it requires presence at a place for an unlawful purpose. Thus the Legislature denounced (1) the act of going to a place and remaining there, (2) with intent to commit an unlawful act.

We see no reason why the State may not deal penally with such an act done with that intent. *Cf. Dominquez v. City and County of Denver,* 147 *Colo.* 233, 363 *P. 2d* 661 (*Sup. Ct.* 1961); *City of Portland v. Goodwin,* 187 *Or.* 409, 210 *P.* 577 (*Sup. Ct.* 1949); *City of Seattle v. Drew,* 70 *Wash. 2d* 405, 423 *P. 2d* 522 (*Sup. Ct.* 1967). Nor do we find obscurity in the words "unlawful purpose." An "unlawful purpose," as the sense of the situation suggests, is a purpose to do an act which the Legislature has forbidden upon pain of conviction for crime or petty offense. The only constitutional question concerns the role to be accorded the "good account" provision.

We are satisfied that a failure to give a good account may not itself be punished or be made an essential element of a crime. See *Ricks v. District of Columbia,* 414 *F. 2d* 1097 (*D. C. Cir. Dec.* 23, 1968); *Baker v. Bindner,* 274 *F. Supp.* 658 (*W. D. Ky.* 1967); *Alegala v. Commonwealth,* 353 *Mass.* 287, 231 *N. E. 2d* 201 (*Sup. Jud. Ct.* 1964); Annotation, 12 *A. L. R. 3d* 1448, 1453–1454 (1967). We are satisfied too that a failure to give a good account may not serve as affirmative proof of presence for an unlawful purpose.

We are troubled, not so much by the alleged vagueness of "good account," for the term may well be sufficiently informative in a given context, but rather by the use of a suspect's silence as affirmative evidence of an intent to do an unlawful act. To use a man's silence in that way would permit a conviction to rest upon nothing more than a failure to give a good account, with the same practical effect as if the statute denounced a failure to give a good account as the substantive offense itself.

We suggested in *Salerno* that the good-account concept could be given a different role, saying (27 *N. J.*, at 296):

"\* \* \* And the ancient vagrancy act, *N. J. S.* 2A:170–4, relating to beggars and idlers, penalizes the offender if he 'does not give a good account of himself.' In the latter situation, the quoted phrase perhaps is essentially a safety measure to protect the innocent whose behavior would otherwise fall within the interdicted conduct. Usually provisions for a good account are associated with conduct or circumstances in themselves offensive or suggestive of an intent to commit a crime. \* \* \*"

In *People v. Bell*, 306 *N. Y.* 110, 115 *N. E.* 2d 821 (*Ct. App.* 1953), an ordinance provided that a person who "loiters" about any toilet, station or station platform of a subway, elevated railway or railroad and who is "unable to give satisfactory explanation of his presence is guilty of an offense." Upholding the ordinance, the court said (115 *N. E.* 2d, at 823):

"\* \* \* We do not agree with the contention of the District Attorney that this clause means that any person found on the premises is required to give an explanation which satisfies any individual police officer by whom he is accosted. If that were true, the statute would furnish no standard of conduct which could be known in advance, and it would be void for uncertainty. \* \* \*

The questionable words \* \* \* merely outline a procedure to be followed in ascertaining whether the person to be charged is loitering about the station or platform. These words do not broaden but restrict the offense. They prevent a defendant from being convicted unless, in addition to other proof that he has been loitering, it appears that he has failed to give an explanation indicating that he is

an implied invitee or licensee, after having been questioned on the scene concerning the reason for his presence. An explanation that is 'satisfactory' means merely one which shows that the person has come there for some purpose which would not render him a trespasser. These words in subdivision 2 which are offensive to defendants neither furnish a basis for conviction standing by themselves, nor do they add any substantive element of the offense. They merely prevent anyone from being convicted of loitering about a station or platform unless, at the time, he was given opportunity to explain his presence by showing that he was not loitering. This is not a substantive factor in what constitutes the offense, but is merely a procedural condition which has to be fulfilled if a prosecution is to succeed."

This view was reaffirmed in *State v. Merolla*, 9 *N. Y. 2d* 62, 211 *N. Y. S. 2d* 155, 172 *N. E. 2d* 541 (*Ct. App.* 1961), *cert.* denied, 365 *U. S.* 872, 81 *S. Ct.* 906, 5 *L. Ed. 2d* 861 (1961), and *People v. Dreares*, 15 *A. D. 2d* 204, 221 *N. Y. S. 2d* 819 (1961), affirmed, 11 *N. Y. 2d* 906, 228 *N. Y. S. 2d* 467, 182 *N. E. 2d* 812 (*Ct. App.* 1962). Thus the good-account provision was read to insure an opportunity for explanation rather than to constitute the offense itself or to provide evidence of it.

Section 250.6 of the Proposed Official Draft of the *Model Penal Code* (July 30, 1962) suggests a similar approach in its treatment of loitering or prowling:

"A person commits a violation if he loiters or prowls in a place, at a time, or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity. Among the circumstances which may be considered in determining whether such alarm is warranted is the fact that the actor takes flight upon appearance of a peace officer, refuses to identify himself, or manifestly endeavors to conceal himself or any object. Unless flight by the actor or other circumstance makes it impracticable, a peace officer shall prior to any arrest for an offense under this section afford the actor an opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and explain his presence and conduct. No person shall be convicted of an offense under this Section if the peace officer did not comply with the preceding sentence, or if it appears at trial that the explanation given by the actor was true and, if believed by the peace officer at the time, would have dispelled the alarm."

The central purpose of our statute being to reach presence at a place for an unlawful purpose rather than to punish silence, we think it fair to say the Legislature intended by the good-account provision to assure the suspect a chance to explain away the circumstances which appear inculpatory. It is fair and appropriate to accord that opportunity. We have some reservation, only because of the evolving view of the self-incrimination provision of the Fifth Amendment which may complicate this scene, either by barring the policeman's inquiry or by requiring warnings that will make the procedure too troublesome to be worthwhile. See *People v. Weger,* 251 *Cal App. 2d* 663, 59 *Cal. Rptr.* 661 (*D. Ct. App.* 1967), *cert.* denied, 389 *U. S.* 1047, 88 *S. Ct.* 774, 19 *L. Ed. 2d* 840 (1968), and *cf. Orozco v. Texas,* 394 *U. S.* 324, 89 *S. Ct.* 1095, 22 *L. Ed. 2d* 311 (1969). But seeing no barrier as of now and deeming the good-account provision to be for the benefit of a suspect, we construe the statute to require the officer to offer an opportunity to explain, and therefore that proof of such an offer is prerequisite to a prosecution under that statute unless the court finds the circumstances prevented an offer or made one plainly unnecessary. We add that if developments hereafter should render such an inquiry unconstitutional, the good-account provision may well fall without impairing the remainder of the statute. The statute is an important instrument for protection of the individual, and since the Legislature would likely want the statute to remain to the extent that it may, we see no impediment to such judicial surgery as will bring the statute within the Constitution.

We do not mean that the sufficiency of the suspect's explanation to the officer is at all controlling at the trial of the charge. We say this not because a policeman cannot evaluate it. Obviously a policeman is able to weigh the sufficiency of an explanation and does so quite commonly when he considers the statements of a suspect in deciding whether there is probable cause for arrest. *United States v. Zimple,*

318 *F. 2d* 676, 679 (7 *Cir.*), cert. denied, 375 *U. S.* 868, 84 *S. Ct.* 128, 11 *L. Ed. 2d* 95 (1963); *Seawell v. United States,* 243 *F. 2d* 909, 912 (4 *Cir.* 1957); *White v. Martin,* 215 *Cal. App. 2d* 641, 30 *Cal. Rptr.* 367, 374–375 (*D. Ct. App.* 1963); *Commonwealth v. Lawton,* 348 *Mass.* 129, 202 *N. E. 2d* 824 (*Sup. Jud. Ct.* 1964); *State ex rel. Dowling v. Martin,* 314 *Mich.* 317, 22 *N. W. 2d* 381 (*Sup. Ct.* 1946); *Harrer v. Mongomery Ward & Co.,* 124 *Mont.* 295, 221 *P. 2d* 428, 434 (*Sup. Ct.* 1950); *State v. Cook,* 182 *Neb.* 684, 157 *N. W. 2d* 151, 153 (*Sup. Ct.* 1968); *Nootenboom v. State,* 82 *Nev.* 329, 418 *P. 2d* 490 (*Sup. Ct.* 1966); *A Model Code of Pre-Arraignment Procedure* (Tent. Draft No. 2, 1969), at 15, 61–65. So, too, the suspect's account may play a role in a policeman's judgment as to whether to frisk a man he has stopped under suspicious circumstances. See *State v. Dilley,* 49 *N. J.* 460, 464, 469 (1967). Rather we give the policeman's judgment no role at the trial of the charge for the reason that it is the court, and not a policeman, who ultimately must decide whether the defendant was present at the place for an unlawful purpose.

To summarize, we hold (1) that the statutory offense consists solely of presence at a place for an unlawful purpose; (2) that the failure, refusal, or inability to give the officer a good account is no part of the offense; (3) that the statute requires, as a condition for prosecution, that the officer offer the suspect a chance to explain away circumstances which indicate presence for an unlawful purpose, unless the court finds that the circumstances prevented the offer or made it plainly unnecessary; (4) that the concluding sentence of the provision of the statute quoted above, to the effect that the absence of a good account shall be evidence of presence for an unlawful purpose, is invalid.

We stress that an arrest cannot be made because a person refused or failed to give a good account. An arrest can be made only if in the total circumstances there is probable cause to believe the individual was present at the place

for an unlawful purpose, *i. e.*, to commit a crime or a petty offense.

■■ Here the police had ample cause to believe the defendant Shucai who owned the car (and so too the other defendants) was at the scene for an unlawful purpose, *i. e.*, to commit the crime of larceny, robbery, or burglary of the tavern owner or his premises. The facts already recited make this evident. Hence the arrest may be sustained under the statute in question.

### III

■■ We add that defendant does not contend that if the arrest of Shucai was lawful, the search of Shucai's automobile was not constitutionally incidental to the arrest. Nonetheless we add a comment with respect to a search of a vehicle when the arrest is under the cited disorderly persons statute. We do so, lest it be thought that because the statute may come within the generic category of "vagrancy," it should follow the vehicle may be searched only for weapons within the reach of the person being arrested.

We have in mind the question suggested in passing in *Preston v. United States,* 376 *U. S.* 364, 368, 84 *S. Ct.* 881, 883, 11 *L. Ed. 2d* 777, 781 (1964), as to whether "there are articles which can be the 'fruits' or 'implements' of the crime of vagrancy." The answer depends upon the ingredients of the offense. See *State v. Barnes,* 54 *N. J.* 1, 9 (1969) ; *State v. Fioravanti,* 46 *N. J.* 109, 124 (1965), *cert.* denied, 384 *U. S. 919,* 86 *S. Ct. 1365,* 16 *L. Ed. 2d* 440 *(1966).* Here the offense being presence at a place for an unlawful purpose, there is reason to believe there will be found on the person or in the vehicle things which are intended to be used to implement that unlawful purpose and will evidence the charge. Hence, here, the search of the vehicle was reasonable even if it were measured solely by an arrest under the disorderly persons statute. See *State v. Boykins,* 50 *N. J.* 73 (1967). Indeed the automobile, being an instrument of that disorderly persons offense, may be seized and searched

on that further basis. *State v. McKnight,* 52 *N. J.* 35, 57–58 (1968). We so read *Dyke v. Taylor Implement Mfg. Co.,* 391 *U. S.* 216, 220–221, 88 *S. Ct.* 1472, 20 *L. Ed.* 2d 538, 543 (1968).

The judgments are affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal.* — None.