164 N.J. Super. 368 (1978)
396 A.2d 604
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
BENJAMIN CROSS AND GERMAN TIMMONS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 1978.
Decided December 14, 1978.
*369 Before Judges LORA, MICHELS and LARNER.
Mr. L. Gilbert Farr, Assistant Prosecutor, argued the cause for appellant (Mr. David Linett, Somerset County Prosecutor, attorney).
Mr. Stanley C. Van Ness, Public Defender, attorney for respondents (Mr. Morton L. Anekstein, Assistant Deputy Public Defender, on the brief).
The opinion of the court was delivered by LORA, P.J.A.D.
Pursuant to leave granted, the State appeals from orders of the Law Division granting defendants' motions to suppress evidence seized without a warrant from the glove compartment of the automobile in which defendants were riding.
On September 6, 1976 at about 6:30 P.M. Trooper Richard Toth of the New Jersey State Police made a motor vehicle stop of a white Cadillac, occasioned by the vehicle's speeding *370 through a radar check point. The trooper proceeded to the driver's side of the Cadillac, advised Timmons as to why he had stopped him and requested Timmons to produce his license and registration. Timmons took out a wallet and handed Toth a Pennsylvania driver's license. Cross, the sole passenger in the vehicle, reached into one of his rear pockets and pulled out a Pennsylvania registration. Toth checked both documents and thought them to be correct and valid.
Returning to his patrol car, Toth began to write a traffic summons for speeding and while doing so radioed for an investigative check (NJIC) on the registration of the white Cadillac. Within a few minutes Toth received a radio response that the vehicle was entered as a stolen motor vehicle by the Camden Police Department. He was advised to remain in his patrol car until a backup unit could get there. While awaiting the arrival of his backup Toth received another radio message, informing him that the Camden Police Department had been contacted after his initial inquiry and had confirmed that the Cadillac was still wanted as a stolen vehicle.
Just about that time Toth's backup, Trooper Legg, arrived. With their guns drawn, both officers approached the Cadillac, Toth on the driver's side, Legg on the passenger side. Both defendants were removed from the Cadillac, handcuffed, informed they were under arrest for possession of a stolen motor vehicle, and advised of their rights pursuant to Miranda v. Arizona, 384 U.S. 486, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1964).
At this point defendant Cross became excited and insisted that he owned the vehicle, that he had reported it stolen, but it had since been returned to him, prompting Toth to search for personal identification of both defendants. With the exception of $1,600 in small bills in two top shirt pockets, defendant Cross had no other items on his person. Defendant Timmons' wallet was empty, Toth earlier having obtained his driver's license.
*371 Since "in his mind it was still a stolen vehicle" and defendants had no identification on them other than "a wallet with no license and the other man, the registration was lying loose in his pocket," Toth was not sure that they were the men they said they were.
Searching for further identification of the two defendants, Toth proceeded to the Cadillac and opened the glove compartment, in which he found a box of tissues and a large black eyeglass container, the largest he had ever seen. Upon opening the eyeglass container, the trooper found four yellow capsules, one white and one gray capsule, and two orange tablets. No glasses were in the container.
Upon returning to the police station Toth telephoned the Camden Police Department informing them of Cross' insistence that the Cadillac was owned by him and requesting the Camden police to check the status of the vehicle more carefully. The Camden police then advised the trooper that the vehicle had been reported as stolen by a Mr. Cross, but that it had been returned to Cross, the Camden police saying, according to Toth, that "they forgot to cancel their teletype in the N.C.I.C. computer." Toth testified that he believed Camden informed him the vehicle had been reported as stolen on July 31, 1976.
The trial judge, citing Whiteley v. Warden of Wyoming State Pen., 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), and State v. Taylor, 140 N.J. Super. 242, (App. Div. 1976), held that "where arresting officers believe there is probable cause, relying on incorrect assertions as to probable cause from a fellow officer so that the search is illegal and invalid and the evidence will be suppressed." He further stated that "any evidence which was obtained as a result of an arrest pursuant to that mistake should be suppressed."
The State contends that the arrest and search were valid as based upon probable cause and incident to a lawful arrest; that they were made under exigent circumstances, and in *372 such circumstances the exclusionary rule should not apply. It further maintains that Whiteley, supra and State v. Taylor, supra, are distinguishable. We agree.
In Taylor the police arrested defendant while she was merely standing on a street corner because they mistakenly believed a warrant was outstanding for her arrest. No attempt to verify their belief that a warrant was outstanding was made. At police headquarters cocaine was found on her person following a body search. In Whiteley a police officer arrested defendant on the basis of an all-state bulletin advising that defendant and another were wanted for burglary. However, the complaint on which the warrant had issued to the sheriff of the county where the offense had occurred clearly could not support a finding of probable cause by the issuing magistrate and the arresting officer was not himself possessed of any factual data tending to corroborate the unidentified informer's tip that Whiteley committed the crime.
As Chief Justice Weintraub pointed out in State v. Burnett, 42 N.J. 377 (1964):
Probable cause then is something sufficient to engender a belief somewhere between a bare suspicion and a conviction of guilt. We take it that Chief Justice Marshall's word "suspicion" would be acceptable if qualified by "well grounded." Further, the issue is not whether the information which reached the officer was true or false but only whether the officer was reasonable in accepting the information as true. And in reaching his "belief" the officer is not limited to evidence admissible in the courtroom. [at 387]
Cf. Franks v. Delaware, ___ U.S. ___, 98 S.Ct. 2674, 57 L.Ed.2d 667, 678 (1978), in which the court considered the question of whether a defendant has the right under the Fourth and Fourteenth Amendments, subsequent to the ex parte issuance of a search warrant, to challenge the truthfulness of factual statements made in an affidavit supporting the warrant. There it was stated as a general proposition that when the Fourth Amendment demands a factual showing *373 sufficient to comprise probable cause, the requirement of "truthfulness" does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, but rather, that the information is believed or appropriately accepted by the officers as true.
Recently, in State v. McDaniel, 156 N.J. Super. 347, 361 (App. Div. 1978), in discussing the permissible scope of warrantless searches of automobiles, we quoted from Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).
* * * Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543, 555, 39 A.L.R. 790 * * *. [at 175-176, 69 S.Ct. at 1310]
Here, unlike the situation in State v. Sims, 75 N.J. 337 (1978), where defendants were first subjected to a search which yielded contraband and only then placed under arrest, defendants were stopped and ticketed for speeding, arrested on the basis of the NCIC check and then the search of the glove compartment for further identification of defendants took place. The search was a component part of an integrated incident and was justified as incidental to a valid arrest since there was in fact an intention on the part of the officers to arrest on the probable cause information possessed by them prior to the search, without regard to what the search might disclose. State v. Sims, supra at 353. State v. Doyle, 42 N.J. 334 (1964). Cf. State v. Boykins, 50 N.J. 73, 77 (1967), and State v. Hock, 54 N.J. 526, 533 (1969), cert. den. 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed. 2d 797 (1970). And see Patterson v. United States, 301 A.2d 67 (D.C. App. 1973), upholding the search of a glove compartment where the arresting officer sought some evidence of ownership of the vehicle which defendant was driving in a *374 factual complex virtually identical to the one involved in the instant case.
Probable cause and the reasonableness of the search must be tested by the nature of the information available to the officers at the time; and certainly there was sufficient reliable information, and not mere suspicion at that time, that the car was stolen. We are of the view that the fact that it was later proved to be false information because of administrative errors of others cannot affect the validity of the officers' actions at the crucial time involved. State v. Burnett, supra 42 N.J. at 387. Just as a search can not be validated by subsequently acquired information, conversely, it can not be invalidated by such subsequent events. See Patterson v. United States, supra at 69; State v. Somfleth, 8 Or. App. 171, 492 P.2d 808 (Ct. App. 1972); United States v. Stevens, 509 F.2d 683 (8 Cir.1975), cert. den. 421 U.S. 989, 95 S.Ct. 1993, 44 L.Ed.2d 479 (1975). But see Carter v. State, 18 Md. App. 150, 305 A.2d 856 (Ct. App. 1973), and State v. Taylor, 60 Wis.2d 506, 210 N.W.2d 873 (Sup. Ct. 1973).
Finally, our Supreme Court explained in State v. Zito, 54 N.J. 206, 210 (1969), that suppression is a judge-made device to deter future acts of insolence in office rather than to rectify a wrong already done. As in Zito, where the search was made in good faith upon the strength of a statute later declared unconstitutional, here the information relied upon was ascertained to be erroneous only after the arrest and search had taken place and the police had acted reasonably and in good faith reliance thereon, so that the purpose of the exclusionary rule would not be served in any way by the suppression of the evidence. State v. Gerardo, 53 N.J. 261, 267 (1969).
The orders of the Law Division are reversed and the matter remanded for trial.