STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. HARVEY SIMS AND LEROY RICHO, DEFENDANTS-APPELLANTS.

Argued October 18, 1977—Decided January 31, 1978.

338

340

*Mr. Gerald P. Boswell,* Assistant Deputy Public Defender, argued the cause for appellants (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Kenneth Ply,* Assistant Prosecutor, argued the cause for respondent (*Mr. Joseph P. Lordi,* Prosecutor, attorney; *Ms. Patricia Arons,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

PASHMAN, J. This appeal requires an application of the standards governing search warrants set forth in *State v. De Simone,* 60 *N. J.* 319 (1972). We are called upon to determine whether a search warrant permitting police to search the premises of a service station and any persons found therein, authorized in connection with an investigation aimed at illegal bookmaking, is unconstitutional as a proscribed general warrant. Should that question be answered in the affirmative, we must decide whether the circumstances of this case are such that the searches of the defendants could

be justified under any of the recognized exceptions to the warrant requirement of the Fourth Amendment.

The factual details of the searches are not in dispute— the suppression motion below was tried under a stipulation of facts.[1] On February 1, 1974 application was made to the County Court of Essex County for a series of warrants. In support thereof, Sergeant Raymond Gilhooley of the City-County Strike Force presented a 112-page affidavit, which was the culmination of an on-going investigation with respect to illegal bookmaking activities. This investigation utilized court-approved electronic surveillance as well as conventional means. The affidavit revealed, in pertinent part, the following bases of the existence of probable cause to suspect that bookmaking activities were indeed going on at the service station in question.

On January 17, 1974 police intercepted a phone call from Binkey's Tavern to a service station owned by one Robert (Bob) Quinlan. Based on other evidence, this tavern was believed to be the headquarters for an illicit lottery and gambling operation. The caller placed two illegal horse bets with a person identifying himself as Bob. On the basis of this sworn information in Sergeant Gilhooley's affidavit and the Sergeant's conclusion that Quinlan would have records and evidence of such gambling operations both on his person and at his service station, a search warrant issued. It authorized the search of the service station premises and any persons found therein. An arrest warrant for Robert Quinlan was also secured. The search was executed on February 2, 1974.

Upon arrival at the service station, the police searched the premises. Mr. Quinlan was placed under arrest and searched. No evidence of any contraband was found on his

---

[1] The court below relied on three documents: a letter of January 20, 1975 by the State reciting the facts to which it stipulated; the Grand Jury testimony of Sergeant Robert Purcell, pp. 64–69; and a three-page report to Captain Evan Miles from Sergeant Purcell, dated February 11, 1974, which described the circumstances surrounding the execution of the search warrant.

person. Samuel Gray, who had been conversing with Quinlan when the police arrived, was also searched. He was found to be in possession of illegal lottery slips. A Mrs. Simmons entered the service station office while the search of the premises was in progress. She spoke to Sergeant Purcell, requesting to see Mr. Quinlan because she had something for him. Sergeant Purcell then identified himself as a police officer and ordered Mrs. Simmons to empty the contents of her pocketbook. Among the contents was a piece of white paper on which notations indicating several lottery bets in the amount of $5 had been made.

Soon thereafter defendant Harvey Sims arrived at the service station office. His person was searched and police found a slip of paper containing $5.50 in lottery play. The record does not indicate whether Sims walked or drove to the station or whether he made any statements to the officers. Nor does it disclose any evidence of suspicious statements or conduct on his part. It merely indicates that he walked into the office and was searched by the officers inside.

Nicholas Sena was then observed by Lieutenant Daniel Chiarello. He was about to enter the gas station office when, upon reaching the door, he observed the unusual activity inside the office. Turning from the door, he ran toward the street but was apprehended before reaching the edge of the gas station property. A search of Mr. Sena's person revealed a white slip of paper with two horse bets totaling $12 and a National Armstrong Daily Horse Racing Sheet for that day, February 2, 1974.

Finally, defendant Leroy Richo entered the office of the service station. He was searched and two lottery slips totaling $10.15 in play were confiscated. Again, the record is silent as to both Richo's mode of arrival and as to any acts, beyond his merely walking into the office, which would tend to place him under suspicion.

All of these individual searches took place while the search of the service station premises was in progress. The search of the station yielded no gambling materials. How-

ever, all the persons searched were placed under arrest. The record does not indicate whether other persons wholly unconnected with the illegal gambling operation were present at any time during the search. Nor does it reveal the time interval between the initial entry by police into the service station office and the arrival of the various defendants. We concern ourselves only with defendants Sims and Richo, the parties to this appeal.

A suppression motion was brought before the County Court by counsel for defendants. He argued that the search warrant was an unconstitutional general warrant and could not be squared with the requirements of *State v. De Simone, supra.* The motion was denied on two theories. First, the search warrant was held to extend to the defendants and was characterized as a valid warrant under these facts. Second, the search was found to have been a reasonable warrantless search as a result of the proximity between the arrival of the defendants and the antecedent events described above. The circumstances found sufficiently exigent to justify the warrantless searches were the officers' reasonable grounds for believing that defendants were engaged in criminal activity and the danger that permitting defendants' departure without a search would have resulted in the loss of the contraband of which they were reasonably believed to be in possession.

The defendants pleaded not guilty and were tried without a jury on a stipulation of the testimony and facts as presented in the suppression hearing. The defendants also stipulated that they knowingly possessed the lottery slips. Both were found guilty of illegal possession of lottery slips in contravention of *N. J. S. A.* 2A:121–3b. Each defendant received a three-month suspended sentence, a $100 fine and was placed on probation for one year. A conspiracy count against each defendant was dismissed.

In an unreported opinion, the Appellate Division affirmed the trial court's denial of defendants' motion to suppress. The opinion emphasized that the warrant did not

broadly encompass the entire premises of the gas station but was limited to the building and those who entered it.[2] The court found that the police were reasonable in concluding that most innocent customers of a gas station do not parade into the office. We granted defendants' petition for certification, 73 *N. J.* 52 (1977).

## I

A search warrant providing for the search of unnamed persons, without a particularized description to distinguish its subjects from the general public, violates both the New Jersey Constitution and the Fourth Amendment of the United States Constitution.

The Fourth Amendment states explicitly:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, *and particularly describing the place to be searched, and the persons or things to be seized.* [Emphasis added.]

The language of the parallel provision of our *N. J. Const.* (1947), Art. I, par. 7, is almost identical:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, *and particularly describing the place to be searched and the papers and things to be seized.* [Emphasis added.]

---

[2]The search warrant permitted search of ". . . the premises of Quinlan Service Station . . . and any persons found therein. . . ." The Appellate Division interpreted this language as limiting the search to persons found in the office. It is not clear what the appeals court meant by office building. The warrant would appear to encompass the entire building on the lot, including the garage section. However, even assuming a limitation to the service station office, our analysis and decision would be unaffected.

General searches have long been deemed constitutionally defective as violative of our fundamental rights. *Marron v. United States*, 275 U. S. 192, 195, 48 S. Ct. 74, 75, 72 L. Ed. 231, 236 (1927). For an understanding of the Fourth Amendment's scope, we need look no further than the following succinct statement concerning its historical underpinnings.

In order to ascertain the nature of the proceedings intended by the 4th Amendment to the Constitution under the terms 'unreasonable searches and seizures,' it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and in England. The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book;' since they placed 'the liberty of every man in the hands of every petty officer.'

> [*Boyd v. United States*, 116 U. S. 616, 624–625; 6 S. Ct. 524, 529, 29 L. Ed. 746, 749 (1886).]

The best description of the particularity requirement of the Fourth Amendment is found in *Marron v. United States, supra*:

The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

> [275 U. S. at 196, 48 S. Ct. at 76, 72 L. Ed. at 237]

It is, of course, now settled that the fundamental protections of the Fourth Amendment are guaranteed against invasion by the States by the Fourteenth Amendment. *Ker v. California*, 374 U. S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963); *Mapp v. Ohio*, 367 U. S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961); *Wolf v. Colorado*, 338 U. S. 25, 27–

28, 69 *S. Ct.* 1359, 93 *L. Ed.* 1782, 1785 (1948). At any rate, our State Constitution provides identical guarantees. *See ante* at 345.

In addition to a particularized description, the Fourth Amendment requires that there be probable cause to believe that the property described in the warrant will be found at the specified premises and in possession of the persons so described. *People v. Nieves,* 36 *N. Y.* 2d 396, 400, 369 *N. Y. S.* 2d 50, 56, 330 *N. E.* 2d 26, 31–32 (1975) ; *see also State v. De Simone,* 60 *N. J.* 319, 321–322, 327 (1972). The instant case involves the relatively uncommon situation where a warrant is issued to search unnamed persons at a specified place. In *State v. De Simone, supra,* Chief Justice Weintraub acknowledged the dearth of reported cases on this subject. He added the observation that

. . . the warrant is sufficient or not depending upon whether there is probable cause to believe persons present are involved in the criminal event.

[60 *N. J.* at 327]

In *De Simone,* the Chief Justice supplied a useful set of guidelines to aid judges faced with warrant applications in the crucial determination as to the existence of probable cause to believe that mere presence at a particular location would implicate a person as a participant in a crime :

On principle, the sufficiency of a warrant to search persons identified only by their presence at a specified place should depend upon the facts. A showing that lottery slips are sold in a department store or an industrial plant obviously would not justify a warrant to search every person on the premises, for there would be no probable cause to believe that everyone there was participating in the illegal operation. On the other hand, a showing that a dice game is operated in a manhole or in a barn should suffice, for the reason that the place is so limited and the illegal operation so overt that it is likely that everyone present is a party to the offense. Such a setting furnishes not only probable cause but also a designation of the persons to be searched which functionally is as precise as a dimensional portrait of them.

As to probable cause, it must be remembered that the showing need not equal a *prima facie* case required to sustain a conviction.

No more is demanded than a well-grounded suspicion or belief that an offense is taking place and the individual is party to it. *State v. Burnett*, 42 *N. J.* 377, 386–388 (1964) ; *State v. Davis*, 50 *N. J.* 16, 23–24 (1967). And, with regard to the Fourth Amendment demand for specificity as to the subject to be searched, there is none of the vice of a general warrant if the individual is thus identified by physical nexus to the on-going criminal event itself. In such a setting, the officer executing the warrant has neither the authority nor the opportunity to search everywhere for anyone violating a law. So long as there is good reason to suspect or believe that anyone present at the anticipated scene will probably be a participant, presence becomes the descriptive fact satisfying the aim of the Fourth Amendment. The evil of the general warrant is thereby negated. To insist nonetheless that the individual be otherwise described when circumstances will not permit it, would simply deny government a needed power to deal with crime, without advancing the interest the Amendment was meant to serve.

[*State v. De Simone, supra* at 321–322]

In applying these criteria to the case before him, the Chief Justice found that a warrant to search an identified automobile and all persons found therein was valid. The search of defendant passenger was upheld. The State's showing in support of the issuance of the warrant indicated that the automobile had been observed participating in a floating lottery "drop." Thus, the warrant satisfied the specificity requirement and was based on probable cause. The fact that the warrant facially authorized the search of a passenger at a time when the automobile was not actually being used in a criminal venture was found to be an insufficient basis for invalidation of the search. Such criticism was found to be hypertechnical and indifferent to the common sense of the situation, since the obvious intent was for the search to be made while the offenders repeated the earlier observed activities. The Court said:

The Fourth Amendment prohibits searches only if they are unreasonable. We see nothing unreasonable about the search here made. The affidavits predicted a rendezvous constituting a part of a criminal operation in which six cars, precisely described, were used. The driver of each of course had to be involved. We think it reasonable to conclude also that a passenger in the case was probably a party, and this for two reasons. First, a driver would not likely

bring or be permitted to bring an uninvolved person who would witness the deposit of such articles in an unattended car and perhaps also the deposit of like objects by the others who were expected to converge at the appointed time. The second reason is that during the surveillance some of the pickup men had been observed to come on foot, and hence it would not be surprising, depending on the location for a particular day, that a pickup man would be given a lift. Hence, we are satisfied there was ample basis for a well-grounded suspicion or belief that every person in a car at the time of the "drop" would be involved in the illicit operation. This is so notwithstanding that the affidavits for the warrants made no mention of passengers.

[60 *N. J.* at 324–325]

The facts in the instant case are not analogous to those in *De Simone.* Defendants Sims and Richo were entering the office area of a service station. While such a place is admittedly not as open to general public invitation as, for instance, a restaurant or department store might be, mere presence at such premises is certainly less suggestive of participation in the owner's criminal activity than would be presence as a passenger in an automobile. Moreover, even presence in an automobile as a passenger will not necessarily implicate one in the illegal acts of the driver. *See United States v. Di Re,* 332 *U. S.* 581, 68 *S. Ct.* 222, 92 *L. Ed.* 210 (1948).

In *Di Re* the defendant had been convicted of knowingly possessing counterfeit gasoline ration coupons. The decisive evidence was obtained by search of his person after he was arrested. The police had no warrant of any kind. An informant had told investigators that he would be purchasing ration coupons from one Buttitta at a named place in the city of Buffalo. Buttitta's car was trailed until it finally parked at the appointed place. Upon approaching the car, the police found the informant, who was the only occupant of the back seat, holding two gasoline coupons in his hand. They were later determined to be counterfeit. The informant told police that he obtained the coupons from Buttitta. Defendant Di Re was sitting in the passenger side of the front

seat, next to Buttitta. He was arrested and searched and counterfeit coupons were found on his person.

The Court held that there was no probable cause to search Di Re. It stressed the particular fact pattern of the transaction, noting that transfer of a ration coupon would not itself suggest illegality. Thus, there was no reason for Di Re to have suspected any wrongdoing based solely upon his awareness of the transfer. Furthermore, the transaction took place on a public street in daytime. Mere presence in the car was not enough to suggest involvement in the criminality. The *De Simone* court distinguished *Di Re* on several grounds. First, the automobile in *Di Re* did not appear to be an instrumentality of the criminal operation. More importantly, the facts were simply not so suggestive of criminal participation.

██ If presence in a car when an illegal transaction takes place is not necessarily indicative of criminal confederacy, it follows that simple entry into the public area of a service station, without more, does not provide probable cause to suspect a person of participation in illegal gambling. Crucial to that determination are the specific facts placed before the judge at the time the warrant is sought. *State v. Kasabucki*, 52 *N. J.* 110, 117–118 (1962). We reaffirm the correctness of Justice Francis' holding that

. . . no mathematical formula exists for application either by a trial or appellate court in deciding whether a search warrant was supported by probable cause. Each case depends upon a sensitive appraisal of the circumstances shown to the issuing judge.

[*State v. Kasabucki, supra* at **117–118**]

██ In the instant case the issuing judge had a voluminous affidavit detailing the participation of many individuals in numerous instances of illegal gambling. With respect to Bob Quinlan's service station, however, the only evidence presented was the single intercepted telephone conversation wherein two illegal bets were placed by a caller from Binkey's Tavern. There was no affirmation that nu-

merous known gamblers had been observed entering the office over a period of time.[3] On the basis of the evidence placed before the issuing judge at the time of the application for the warrant, we find that he lacked any legitimate basis for concluding that there was probable cause to believe that all persons who might be found on the premises of the service station were engaged in illegal gambling activities. Thus, we hold that the search warrant was indeed a general warrant, violative of both the Fourth Amendment and *N. J. Const.* (1947), Art. I, par. 7.

## II

In view of our conclusion that the warrant was an invalid basis for a search of defendants, we must address the additional question of whether the search of their persons was permissible under any of the exceptions to the Fourth Amendment's warrent requirement. A search conducted without a warrant is *per se* unreasonable — subject to a few specific exceptions. *Schneckloth v. Bustamonte,* 412 *U. S.*

---

[3]We note that in *Commonwealth v. Smith,* 348 *N. E.* 2d 101 (Mass. 1976), the court upheld a warrant permitting the search of a certain apartment and "any person present who may be found to have . . . [heroin] in his possession or under his control or to whom such property may have been delivered. . ." The search of all persons found in the apartment was upheld. Probable cause was bottomed on an affidavit in which an informant asserted that he had been inside the apartment on two occasions within the preceding ten days. The affidavit claimed to have seen the occupants selling heroin to other persons. Furthermore, police observation over a period of time resulted in the sighting of known heroin traffickers entering and leaving the apartment.

However, even where there is police observation of known lawbreakers operating from a given location, a warrant permitting the search of all individuals therein is impermissible if that location is a truly public place. In *People v. Nieves,* 36 *N. Y.* 2d 396, 369 *N. Y. S.* 2d 50, 330 *N. E.* 2d 26 (1975), the Court of Appeals invalidated the search of all persons found in a tavern from which a known bookmaker had been seen taking bets on the very afternoon of the search. There was not a sufficient probability that every person in a tavern is a gambler as opposed to an innocent customer.

218, 219, 93 *S. Ct.* 2041, 2043, 36 *L. Ed.* 2d 854, 858 (1973) ; *see State v. Naturile,* 83 *N. J. Super.* 563, 569 (App. Div. 1964) ; *State v. Roccasecca,* 130 *N. J. Super.* 585, 592–593 (Law Div. 1974). The burden is on the state as the party seeking the exception, to show the need for it. *United States v. Jeffers,* 342 *U. S.* 48, 51, 72 *S. Ct.* 93, 95, 96 *L. Ed.* 59, 64 (1951) ; *State v. King,* 84 *N. J. Super.* 297, 300 (App. Div. 1964) rev'd on other grounds, 44 *N. J.* 346 (1965) ; *State v. Manghan,* 126 *N. J. Super.* 162 (Law Div. 1973).

The State contends that the searches conducted on Sims and Richo fit within two of the warrant exceptions — as searches incident to arrest and as searches made in exigent circumstances. The trial judge found them valid under the latter theory. The Appellate Division did not reach this issue. For the reasons which follow, we hold that the searches of these defendants are not sustainable under any of the exceptions to the Fourth Amendment warrant requirement.

■ When a valid arrest based on probable cause has been made, a police officer is entitled to search the arrestee's person in order to protect himself and to insure that evidence is not destroyed. *Chimel v. California,* 395 *U. S.* 752, 763, 89 *S. Ct.* 2034, 2040, 23 *L. Ed.* 2d 685, 694 (1969) ; *State v. Gray,* 59 *N. J.* 563, 569 (1971). However, to have a search incident to a lawful arrest it is first necessary to have a valid arrest. Here, the defendants were first subjected to

Similarly, we note the application of the *De Simone* principles in *State v. Riggins,* 138 *N. J. Super.* 497 (Law Div. 1976) where a warrant authorizing the blanket search of anyone found in a tavern was voided as a general warrant. The facts in that case tracked closely with those in *Nieves,* as surveillance of the tavern over several days revealed the presence of certain known gambling offenders.

Although the service station in the instant case is not so likely to be frequented by members of the public as is a tavern, it surely possesses greater indicia of a public place than does a residential apartment.

a search which yielded contraband and only then placed under arrest.

Officers cannot search in order to arrest, nor arrest because of the product of the search. A search undertaken merely for the purpose of uncovering evidence with which to arrest and convict of crime is not made lawful because the desired evidence is obtained [citation omitted]. Absent a valid search warrant, they must arrest validly in which event they may search reasonably as an incident of the arrest.

[*State v. Doyle*, 42 *N. J.* 334, 342–343 (1964), citing *Preston v. United States*, 376. *U. S.* 364, 84 *S. Ct.* 881, 11 *L. Ed.* 2d 777 (1964); *Ker v. California, supra;* Annotation, 94 *L. Ed.* 671 (1950)]

More specifically, in order for a search to be justified as incidental to a valid arrest, there must have been an intention on the part of the officers to arrest on the information possessed by them prior to the search, without regard to what the search might disclose. *See State v. Baker,* 112 *N. J. Super.* 351, 356–357 (App. Div. 1970), relying on *Jones v. United States,* 357 *U. S.* 493, 78 *S. Ct.* 1253, 2 *L. Ed.* 2d 1514 (1958).

The decision in *State v. Doyle, supra,* is entirely consistent with the aforestated principles. The facts of that case clearly indicated the existence of a pre-search intent to arrest the defendant based on the ample probable cause possessed by the police. Thus the search and arrest there were both valid despite being "connected units of an integrated incident." *See State v. Baker, supra,* 112 *N. J. Super.* at 357.

In the instant case the arrests were directly contingent upon the results of the searches, and there is no indication of any intent on the part of the officers to have arrested defendants even if no incriminating evidence was found on them.

A warrantless arrest may be made only where there is probable cause. *Wong Sun v. United States,* 377 *U. S.* 471, 479, 83 *S. Ct.* 407, 412, 9 *L. Ed.* 2d 441, 450

(1963) ; *Draper v. United States,* 358 *U. S.* 307, 312–313, 79 *S. Ct.* 329, 332–333, 3 *L. Ed.* 2d 327, 331–332 (1959).

Probable cause exists where the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

> [*Draper v. United States, supra* 358 *U. S.* at 313, 79 *S. Ct.* at 333, 3 *L. Ed.* 2d at 332, citing *Carroll v. United States,* 267 *U. S.* 132, 162, 45 *S. Ct.* 280, 288, 69 *L. Ed.* 543, 555 (1924)]

So far as the record indicates, defendants made no furtive gestures or incriminating comments. Their mere entry into the service station office did not provide probable cause to believe they were engaged in illegal gambling. They could have entered for any number of legitimate purposes, including the purchase of automobile parts, cigarettes or maps. They may have been seeking restroom keys, directions or change for a vending machine. Since defendants were searched immediately upon entry, the police had no way of knowing the purpose of their visit.

The Appellate Division reasoned that the discovery of incriminating evidence on Mr. Gray and the subsequent finding of gambling paraphernalia on Mrs. Simmons after she entered the office provided the police with probable cause to believe that any other persons who entered the office were also engaged in criminal activities. In a less public location such an assumption might be tenable. However, a service station office is open to the public at large and is often frequented for legitimate purposes. Thus, mere entry into the office, standing alone, cannot provide probable cause to believe a person is engaged in criminal conduct. Absent some evidence of a planned rendezvous of co-conspirators at a given time, simple presence in a public or quasi-public place is not indicative of probable culpability. This analysis also applies to the search of defendant Richo. The fact that

two additional persons, Sims and Mrs. Sena, had been searched and detained did not provide probable cause for his arrest any more than did the earlier arrests furnish probable cause with respect to Sims.

At the suppression hearing, the alternative holding of the judge was that the searches of these defendants were valid as warrantless searches necessitated by exigent circumstances. He concluded that the pattern of activity observed by police indicated that a steady stream of bettors was parading into the office. Thus, the searches were found reasonable as preventing defendants from leaving with contraband in their possession.

A police officer may make a warrantless search where there is probable cause to believe evidence will be discovered and he has a reasonable belief that failure to act will result in destruction or removal of evidence. *State v. Smith*, 129 *N. J. Super.* 430, 435 (App. Div. 1974), certif. den. 66 *N. J.* 327 (1974); *State v. Slobodian*, 120 *N. J. Super.* 68, 77 (App. Div. 1972), certif. den. 62 *N. J.* 77 (1972). We have no doubt that any incriminating evidence on the persons of defendants would have disappeared with them. Absent a search, the contraband would have been unobtainable. However, for the same reason that we found a lack of probable cause to arrest defendants prior to the searches, we find no probable cause for the searches themselves.

There is no discernible difference in the standards for determining probable cause for searches as apposed to arrests. In *State v. Smith, supra,* the Appellate Division acknowledged that "[t]he shorthand test is whether under the circumstances a prudent man would be warranted in the belief that a crime probably is being committed." 129 *N. J. Super.* at 433. No evidence was presented which would indicate that legitimate customers do not frequent Quinlan's Service Station. Therefore, mere arrival at the service station office is not sufficient to meet the standard of well-founded suspicion required to provide

probable cause for a search. Such a gross intrusion on one's constitutional rights is not to be lightly countenanced.

The convictions of defendants Sims and Richo are reversed. Since all charges stemmed from evidence which must now be suppressed, the indictments returned against defendants are hereby dismissed.

*For reversal* — Chief Justice HUGHES and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—6.

*For affirmance*—None.