ALITO, Circuit Judge,
concurring and dissenting.
I join parts I, II, IIIA, and IIIB of the opinion of the court. I cannot, however, join parts IIIC and HID, which reverse the award of summary judgment in favor of Monroe Township Police Officer Robert Armstrong with respect to the plaintiffs’ claims regarding the search of Corey Baker and the alleged use of excessive force during the Bakers’ detention. In my view, a careful analysis of the applicable law and the summary judgment record reveals that the district court’s award of summary judgment with respect to these claims should be affirmed.
I.
On June 1, 1990, Armstrong applied for a “no-knock” warrant to search an apartment in Williamstown, New Jersey, “and persons found therein.” App. at 248-51. In support of this application, Armstrong submitted an affidavit stating: that on May 24, 1990, a confidential informant told him that Cheryl Woods and her boyfriend, “Clem” (later identified as Inez Baker’s son Clementh Griffin), were distributing cocaine from this apartment; that on May 27 Armstrong sent a confidential informant into the apartment to make a controlled purchase of cocaine from Cheryl Woods and that the confidential informant did so; that on May 29 a concerned citizen informed Armstrong that “numerous young adults and juveniles” had been going into the apartment to purchase cocaine; and that on May 31 Armstrong conducted a short surveillance of the apartment and observed young people entering and leaving the apart *1196 ment in a manner that, in Armstrong’s experience, was indicative of drug distribution activity. Id. Armstrong’s application was granted, and the court issued a “no-knock” warrant. Id. at 147.
At about 8:25 p.m. that evening, Armstrong and a team of officers under his direction executed the warrant. Id. at 63, 95. Armstrong identified the other officers as Sergeant R. Ferris and Lieutenant T. Watson of the Gloucester County Prosecutor’s Office and Special Agents K. Donnelly and J. Vitaletti of the federal Drug Enforcement Administration. Id. at 59-60. Upon arriving at the apartment, the officers quickly left their unmarked van and ran toward the door with their guns drawn. Id. at 46, 62-64. At precisely the time when the officers arrived, the plaintiffs in this case were on or near the steps of the apartment. Corey Baker, age 17, was on the steps. Tiffany Baker, age 15, was behind him at the bottom of the steps, followed by her older sister, Jacquine Anderson, and their mother, Inez Baker (collectively “the Bakers”). Id. at 62, 65, 119, 129. Armstrong was the first of the officers to leave the van and reach the door of the apartment. Id. at 62, 65-66. He stated that when he saw the Bakers he could not tell whether they were arriving at or leaving the apartment and that he had no idea who they were or what their connection might be with the apartment. Id. at 78-79, 85. He added that he did not know whether one of them might be Cheryl Woods and that he thought that one of them might possibly be armed. Id. at 75, 79. As Armstrong neared the Bakers, he shouted for them to get down. Id. at 62. He then ran past them and entered the apartment. Id. at 62, 66, 131.
Some of what happened next outside the apartment is in dispute. In his deposition, Armstrong stated that two of the officers remained outside with the Bakers. Id. at 77. In their depositions, the Bakers agreed that some officers (not including Armstrong) remained outside, but the Bakers estimated that as many as 20 officers participated in the raid. Id. at 119, 123, 129, 131. The Bakers stated that some of the officers who remained outside (none of whom apparently were deposed) handcuffed them, kept them on the ground, and pointed guns at them. Id. at 120-23, 131-32. In addition, Inez Baker stated that one of these officers took her purse, emptied its contents on the ground, examined the contents, put them back in the purse, and then returned the purse to her. Id. at 117.
Inez Baker estimated that she and the children accompanying her remained outside the apartment for about ten minutes. Id. at 366. There is no evidence that Armstrong was present outside the apartment at any time during this period. Nor is there any evidence that Armstrong looked out at the area where the Bakers were held, that he would have been able to see the Bakers from inside the apartment through any door or window, or that he had any communications during this period with any of the officers who were outside.
While the Bakers remained outside the apartment, Armstrong and the other officers who had entered secured the premises and its occupants, Cheryl Woods and Clementh Griffin. Id. at 67, 98, 115-16, 122. According to Armstrong, he then shouted out the door “to bring those people in.” Id. at 98. The Bakers were brought into the kitchen, which was the first room reached through the door. Id. at 71, 84, 112, 124-26. The Bakers said that they were handcuffed when they were led into the apartment, and Inez Baker said that one of the officers pointed a gun at her during this time. Id. at 112-14, 123-25, 132. However, none of the Bakers said that Armstrong was in the kitchen when they were brought in. Id. at 113. Corey Baker stated that he was taken through the kitchen and living room to the first bedroom. Id. at 132. There, he said, several officers (not including Armstrong) subjected him to a thorough search before they returned him to the kitchen. Id. at 134-35.
Armstrong stated that after the Bakers were brought in, he went to the kitchen, spoke to Inez Baker, and explained why she and the children accompanying her had been ordered to get down. Id. at 68-69. At this point, he said, he still did not know who the Bakers were. Id. He stated that he then went to another room and was speaking with Clementh Griffin when he heard something *1197 that Inez Baker was saying. Id. at 69. According to Armstrong, he asked Sergeant Ferris who Inez Baker was and was told that she was Clementh Griffin’s mother. Id. Armstrong stated that he asked Clementh Griffin whether his mother and the other Bakers had “anything to do with what may be found in [the] house,” and Griffin answered “no.” Id. Armstrong said that he then went back to the kitchen, explained to Inez Baker what had occurred, apologized for the inconvenience, and told her that she and her children (other than Clementh Griffin) were free to go. Id. Similarly, Inez Baker said that, after she and the children accompanying her had been kept in the kitchen for some time, Armstrong came out of another room and said that they should be released. Id. at 114. She and Armstrong both estimated that about 15 minutes had then elapsed from the time when she had been brought into the apartment. Id. at 71, 115.
Armstrong said that he never saw Inez Baker in handcuffs. (He does not appear to have been asked whether he ever saw the other Bakers in handcuffs.) Armstrong also stated that he never saw guns pointed at any of the Bakers. Id. at 67-68, 70.
II.
Search of Corey Baker. Summary judgment was properly entered in favor of Armstrong on this claim for two separate reasons.
A. First, the terms of the search warrant doom this claim. The warrant (which is reproduced in full as an appendix to this opinion) consisted of a printed form with typewritten entries (possibly made prior to the submission of the application to the judge) and handwritten entries (apparently made by the judge).[1] Paragraph one recited that Armstrong had applied “for a search warrant for the (x) premises (x) person (x) vehicle described below.” App. at 147. Paragraph two commanded Armstrong and other officers “to search the (x) premises described below (a;) person(s) described below (x) vehicle described below.” Id. Paragraph 4 stated:
The following is a description of the (x) premises, (x) person, (x) vehicle to be searched:

an apartment located in an apartment building at 607 South Main Street, Williamstown, New Jersey, a three (S) story wood frame residence located on the comer of South Main Street and Virginia Avenue, having a parking lot on the Virginia Avenue side and directly across the street from the Williamstown Fire Company.

Id.

To my mind, by far the best interpretation of these provisions of the warrant is that they authorized a search of, not only the premises of the apartment, but also any persons found on the premises. That the judge who signed the warrant intended to authorize a search of some person or persons seems perfectly clear, since the space for “person(s)” in paragraph 2 and the space for “person” in paragraph 4 were both marked with x’s. (Are we to assume that both these x’s were mistakes?) The only remaining question, then, is the identity of the person or persons who were to be searched, and even if we look only at paragraph 4, the answer to this question seems reasonably plain. Since paragraph 4 is supposed to describe “premises,” “person[s],” and “vehi-ele[s],” but expressly refers only to the premises of the apartment, the most reasonable interpretation is that the warrant authorized a search of the premises and any persons or vehicles found on the premises.
This interpretation is reinforced by paragraphs one and two of the warrant and the warrant application. As previously noted, Armstrong applied for authorization to search the premises of the apartment “and persons found therein.” Id. at 251. Paragraph one of the warrant, which paraphrased the terms of Armstrong’s application, stated that he had applied “for a search warrant for the (x) premises [and] (x) person(s) ... described below.” Id. at 147. Thus, para *1198 graph one clearly equated the phrase “persons found therein” with the phrase “persons ... described below.” Paragraph two then authorized a search of the “(x) premises [and] (x) person(s) ... described below.” Id. Consequently, paragraph two authorized precisely what, according to paragraph one, Armstrong sought — and that was permission to search the premises “and persons found therein.” Id. at 251.
For these reasons, I believe that the warrant authorized a search of any persons found on the premises. This interpretation is consistent with all of the language of the warrant, and it gives effect to and harmonizes all of the warrant’s provisions. I acknowledge, of course, that it would have been better draftsmanship to have referred specifically in paragraph 4 to any persons found on the premises, but for practical purposes the scope of the search that was authorized seems to me quite apparent.
The majority’s alternative interpretation is completely unpersuasive. The majority writes:
[T]he only common-sense interpretation of the [warrant] is that no one ever bothered to complete it to include specified persons as well as premises. This flawed document does not demonstrate that the magistrate determined search of any particular person to be justified.
Maj. typescript at 1188 n. 1. From this paragraph, I take it that the majority believes that the municipal judge intended to authorize a search of named persons but neglected to ensure that the names of these persons were included in the warrant. However, this interpretation requires the assumption that the judge made a serious and basic error. Moreover, this interpretation is completely inconsistent with the search warrant application, which did not request authorization to search any named persons but, instead, sought permission to search “any persons found” on the premises. Thus, in order to accept the majority’s interpretation, one must assume that the judge who issued the warrant rejected Armstrong’s request for authorization to search any persons found on the premises, decided instead to authorize a search of named individuals (although such authorization had not been sought), and then forgot to ensure that these individuals were identified in the warrant. This interpretation, far from being “the only common-sense interpretation” of the warrant, seems to me far-fetched.
After advancing this interpretation of the warrant, the majority contends that if the warrant were interpreted to authorize the search of any person or persons it would violate the Fourth Amendment’s particularity requirement.[2] After noting that the warrant did not name any particular person or persons, the majority continues:
Nor did the language in the description refer to a place and any or all “persons found therein” as did the warrants before the courts in State v. Sims [75 N.J. 337], 382 A.2d 638, 642 (N.J.1978) and State v. DeSimone [60 N.J. 319], 288 A.2d 849, 850 (N.J.1972). The Fourth Amendment requires that the warrant particularly describe the place to be searched and the persons to be seized. The face of the warrant demonstrates its failures to meet the requirement of the Fourth Amendment.
Id. This argument is wrong and is not supported by either State v. Sims, 75 N.J. 337, 382 A.2d 638, 642 (1978), or State v. De Simone, 60 N.J. 319, 288 A.2d 849, 850 (1972).
Sims involved the application of legal principles articulated in De Simone. There, the New Jersey Supreme Court rejected the argument that a warrant authorizing a search of all persons found on described premises violated the Fourth Amendment’s particularity requirement. Writing for the court, Chief Justice Weintraub observed:
With regard to the Fourth Amendment demand for specificity as to the subject to be searched, there is none of the vice of a general warrant if the individual is thus identified by physical nexus to the ongoing *1199 criminal event itself. In such a setting, the officer executing the warrant has neither the authority nor the opportunity to search everywhere for anyone violating a law. So long as there is good reason to suspect or believe that anyone present at the anticipated scene will probably be a participant, presence becomes the descriptive fact satisfying the aim of the Fourth Amendment. The evil of the general warrant is thereby negated. To insist nonetheless that the individual be otherwise described when circumstances will not permit it, would simply deny government a needed power to deal with crime, without advancing the interest the Amendment was meant to serve.
288 A.2d at 850.
Instead of presenting a “particularity” question, Chief Justice Weintraub wrote, a warrant authorizing a search of any person found on described premises presents a question of probable cause:
On principle, the sufficiency of a warrant to search persons identified only by their presence at a specified place should depend upon the facts. A showing that lottery slips are sold in a department store or an industrial plant obviously would not justify a warrant to search every person on the premises, for there would be no probable cause to believe that everyone there was participating in the illegal operation. On the other hand, a showing that a dice game is operated in a manhole or in a barn should suffice, for the reason that the place is so limited and the illegal operation so overt that it is likely that everyone present is a party to the offense. Such a setting furnishes not only probable cause but also a designation of the persons to be searched which functionally is as precise as a dimensional portrait of them.

Id.

This analysis is specifically approved in Professor LaFave’s treatise:
Unquestionably, the De Simone rationale is correct. A search warrant authorization to search all persons found within a specifically described place is not lacking in particularity in the sense that the executing office will be unable readily to determine to whom the warrant applies. Rather, the question is whether there is sufficient particularity in the probable cause sense, that is, whether the information supplied the magistrate supports the conclusion that it is probable anyone in the described place when the warrant is executed is involved in the criminal activity in such a way as to have evidence thereof on his person. If the evidence tendered to the magistrate supports such a conclusion, then the search-all-persons-present warrant is unobjectionable. If the evidence does not support such a conclusion, then the searches of those present find no justification in the search warrant.
2 Wayne R. LaFave, Search and Seizure § 4.5e at 231 (1987) (footnotes omitted).
I agree with De Simone and with Professor LaFave’s analysis, and I therefore think that the validity of the warrant at issue in this case depends on whether the search warrant application established probable cause to believe that all persons found on the premises of the apartment were involved in the regular drug activity that had been going on at that location. The majority says nothing with respect to this question, but I believe that the requisite probable cause was shown.
The holdings in State v. De Simone, supra, and State v. Sims, supra, both of which seem to me to be correct, serve to frame the question presented by the warrant involved here. In De Simone, the police had probable cause to believe that a particular car was regularly used to drop off “policy” slips, a warrant was issued to search the car and “all persons found therein,” and the New Jersey Supreme Court upheld the warrant, observing that there was probable cause to believe that any person found in the car “whether driver or passenger would be involved in the criminal operation.” 288 A.2d at 854. In Sims, by contrast, the police intercepted a single telephone call to a service station owned by “one Robert (Bob) Quinlan,” and during this call “[t]he caller placed two illegal horse bets with a person identifying himself as Bob.” 382 A.2d at 641. A warrant was issued to search all persons found in the station, but the New Jersey Supreme Court *1200 concluded that there was no “probable cause to believe that all persons who might be found on the premises of the service station were engaged in illegal gambling.” Id.
In the case now before us, the police had evidence that the apartment had been the scene of frequent drug sales to a large number of buyers for some time. Thus, there was probable cause to believe that anyone living in the apartment was involved in this activity. There was also a good likelihood that visitors to the apartment were drug buyers. While it was certainly possible that there would also be some innocent visitors to the apartment (such as the Bakers), I think that there was probable cause to search anyone found on the premises.
There is considerable authority supporting this conclusion. In Commonwealth v. Smith, 370 Mass. 335, 348 N.E.2d 101 (1976), the Supreme Judicial Court of Massachusetts upheld a provision of a warrant authorizing a search of any person found in an apartment. The affidavit submitted in support of the warrant stated that an informant had recently seen heroin sales within the apartment and that police officers conducting a surveillance of the apartment had seen known drug traffickers entering and leaving. Id., 348 N.E.2d at 106. “From these asserted facts and fan-inferences drawn therefrom,” the court stated, “it was permissible to conclude that it was probable that any person in the apartment was a participant in the trafficking in heroin there.” Id.
In State in Interest of L.Q., 236 N.J.Super. 464, 566 A.2d 223 (App.Div.1989), the court upheld a comparable warrant provision based on facts strikingly similar to those present in the ease now before us. The warrant was issued based on an affidavit stating that surveillance of the residence had revealed comings and goings characteristic of drug sales and that a controlled purchase of drugs had been made at the residence. Id., 566 A.2d at 223-24. The court wrote:
The evidence was sufficient to create a well-grounded suspicion or belief that numerous sales of [drugs] were being conducted in the premises. Although the affidavit did not exclude the possibility of other activities on the premises, the description of the activity actually observed provided a firm foundation for the suspicion or belief that any person in the private premises was involved in the overt unlawful activity of sale and possession of cocaine. Such a suspicion or belief is not limited to persons already there when the police arrive, but reasonably extends to a person who enters the premises during the search.
Id. at 226 (footnote omitted).
The Superior Court of Pennsylvania has handed down similar decisions. See Commonwealth v. Graciani, 381 Pa.Super. 626, 554 A.2d 560, 561-62 (1989); Commonwealth v. Heidelberg, 369 Pa.Super. 398, 535 A.2d 611, 615 (1987). So have courts in other jurisdictions. See, e.g., Gonzales v. State, 761 S.W.2d 809, 811 (Tex.App.1988); People v. Betts, 90 A.D.2d 641, 456 N.Y.S.2d 278, 279 (1982). In accordance with these authorities, I conclude that the warrant in this case was supported by probable cause to search any one found on the premises.[3]
B. Moreover, even if the warrant did not authorize the search of Corey Baker and that search was illegal, Armstrong was still entitled to summary judgment pursuant to our court’s well established standard for individual liability in an action under 42 U.S.C. § 1983. In such an action, we have held, an individual defendant is liable only if he or she has “personal involvement in the alleged wrongs.” Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988). “Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.” See also Keenan v. Philadelphia, 983 F.2d 459, 466 (3d Cir.1992); Andrews v. Philadelphia, 895 F.2d 1469, 1478 *1201 (3d Cir.1990).[4] Id. Here, there is no suggestion in the summary judgment record that Armstrong personally directed the other officers to search Corey Baker, and there is insufficient evidence to show either his “actual knowledge” or “acquiescence.” As for actual knowledge, although the majority thinks that a rational trier of fact could infer, based solely on the small size of the apartment, that Armstrong was aware that the search of Corey Baker was taking place, I am doubtful about this.[5] But in any event, even if a rational trier of fact could infer that Armstrong was aware that Corey Baker was being searched, I think that the “actual knowledge” requirement demands something more — viz., knowledge that the other officers lacked a lawful basis for the search.
A simple hypothetical demonstrates the need for this additional showing. Suppose a supervisory policy official happened to observe subordinates from some distance while they were carrying out a Terry frisk. If it turned out that this frisk was unlawful because the frisking officers lacked reasonable suspicion, could the supervisory official be held liable under Section 1983 simply because he or she had actual knowledge that the frisk had occurred? I think the answer must clearly be “no.” If the supervisor did not know (or at least have cause to know)[6] that reasonable suspicion was lacking, the supervisor should not be liable.
Here, there is no direct or circumstantial evidence that Armstrong possessed such knowledge. All that the record shows is that Armstrong had seen Corey Baker, a 17 year old, a few steps from the door of an apartment believed to be a center of cocaine sales to young people, that Corey Baker was then held outside for perhaps ten minutes by other officers, and that immediately thereafter Corey Baker was taken into the apartment to the first bedroom and searched. From these facts, it cannot reasonably be inferred that Armstrong knew (or should have known) that the other officers did not have a legitimate basis for searching Corey Baker — such as consent or probable cause based on a pat down or statements made by other persons on the scene. Nor can it be inferred that Armstrong acquiesced in the allegedly illegal conduct. Accordingly, the district court was correct in granting summary judgment in favor of Armstrong on the claim grounded on the search of Corey Baker.
III.
Excessive Force. I now turn to the claim based on the use of excessive force during the Bakers’ detention. The majority holds— and I agree — that the detention of the Bakers during the execution of the warrant was itself proper. The majority concludes, however, that the Fourth Amendment was violated by the use of handcuffs and guns during that detention and that the evidence is sufficient to sustain a judgment against Armstrong for this violation.
Claims that law enforcement officers used excessive force in the course of an arrest or investigatory stop must be analyzed under the “reasonableness” standard of the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The Supreme Court has explained:
*1202 Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because “[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,” . . . however, its proper application requires careful attention to the facts and circumstances of each particular case....
The “reasonableness” of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.
Id. (citations omitted).
If an officer is making an arrest, it seems to me that the use of handcuffs will always be reasonable. As for the use of handcuffs during an investigatory stop and the drawing of a gun during an arrest or an investigatory stop, the cases hold that reasonableness must be judged based on the particular circumstances of the case. See, e.g., Foote v. Dunagan, 33 F.3d 445, 448-49 (4th Cir.1994) (reasonable to draw gun during investigatory stop); United States v. Fountain, 2 F.3d 656, 666 (6th Cir.), cert. denied, — U.S. —, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993) (reasonable to draw gun and use handcuffs during investigatory stop); Tom v. Voida, 963 F.2d 952, 958 (7th Cir.1992) (reasonable to kneel and attempt to handcuff during investigatory stop); Courson v. McMillian, 939 F.2d 1479, 1493 (11th Cir.1991) (reasonable to point shotgun and direct person to he on ground during investigatory stop); United States v. Haye, 825 F.2d 32, 35 (4th Cir.1987) (reasonable to wrestle to ground and use handcuffs during investigatory stop); United States v. Nargi, 732 F.2d 1102, 1106 (2d Cir.1984) (“ ‘[T]here is no hard and fast rule concerning the display of weapons’ in investigative stops.”); United States v. Taylor, 716 F.2d 701 (9th Cir.1983) (reasonable to draw gun and use handcuffs during investigatory stop); cf. Black v. Stephens, 662 F.2d 181, 188-89 (3d Cir.1981), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982) (officer’s pointing of gun during traffic altercation violated due process).
In this case, therefore, in order to hold Armstrong hable for the improper use of handcuffs and guns by the other officers, it must be shown (a) that Armstrong knew that the other officers used handcuffs and guns and (b) that Armstrong knew that the other officers lacked reasonable grounds for their conduct.
I beheve that the summary judgment record is sufficient to estabhsh the first element described above.[7] I do not think, however, that the record supports the inference that Armstrong knew, at any point appreciably before he ordered the Bakers’ release, that the other officers lacked a reasonable basis for handcuffing the Bakers or holding them at gunpoint. Moreover, the record does not show that Armstrong recklessly failed to inquire about the basis for the other officers’ actions. The record does not establish how much time elapsed between the point when he first saw that the Bakers were handcuffed and held at gunpoint and the point when he ordered their release, but it appears that this period must have been less than 15 minutes, see supra at 1192-93, and the record shows that Armstrong was busy during this time questioning Clementh Griffin. Accordingly, I do not see how Armstrong could be held to have had “actual knowledge” of or to have “acquiesced” in the constitutional violations that the other officers allegedly committed.
IV.
For these reasons, I believe that the district court correctly granted summary judgment in favor of Armstrong. I share the majority’s sympathy for the Bakers’ plight. It was a most unfortunate coincidence that they happened to arrive at the scene of a drug search just as the officers were arriving to execute the warrant. Their experience *1203 must have been terrifying. It is also most unfortunate that, prior to the expiration of the statute of limitations, the Bakers did not ascertain the identities of the officers who allegedly engaged in the conduct that is claimed to have violated their constitutional rights. Sympathy for the Bakers, however, does not justify a decision that ignores the deficiencies in the summary judgment record. I therefore dissent from the decision of the majority insofar as it reverses the district court’s award of summary judgment.
APPENDIX[8]
SUPERIOR COURT OF NEW JERSEY
STATE OF NEW JERSEY vs Cheryl Woods Defendant
SEARCH WARRANT
To Detective Robert Armstrong and/or any officer of Gloucester County Prosecutor’s Office, any officer of the New Jersey State Police or any officer of any Police Department having jurisdiction:
1. This matter being opened to the Court by Detective Robert Armstrong of Monroe Township, on application for the issuance for a search warrant for the (x) premises (x) persons (x) vehicle described below, and the Court having reviewed the (x) affidavit of ( ) testimony under oath of the said Detective Robert Armstrong and being satisfied therefrom that located therein or thereon are:
evidence of possession and distribution of controlled dangerous substances, including, but not limited to, controlled dangerous substances and relating paraphernalia, records, documents and other items relating to the possession and distribution of controlled dangerous substances,
and that probable cause exists for the issuance of such warrant:
2. YOU ARE HEREBY COMMANDED to search the (x) premises described below (x) person(s) described below (x) vehicle described below and to serve a copy of this warrant on such person or on the person in charge or control of such premises;
3. YOU ARE HEREBY ORDERED, in the event you seize any of the above described articles, to give a receipt for the property so seized to the person whom it was taken or in whose possession it was found, or in the absence of such person to leave a copy of this warrant together with such receipt in or upon the said premises from which the property is taken.
4. The following is a description of the (x) premises, (x) person, (x) vehicle to be searched:
an apartment located in an apartment building at 607 South Main Street, Williamstown, New Jersey, a three (3) story wood frame residence located on the corner of South Main Street and Virginia Avenue, having a parking lot on the Virginia Avenue side and directly across the street from the Williamstown Fire Company.
5. Special instructions (Time Limitations, etc.):
Anytime day or night — no knock
Given and issued under my hand at 10 o’clock p m., this First day of June, 1991.
SUR PETITION FOR PANEL REHEARING WITH SUGGESTION FOR REHEARING IN BANC
May 1, 1995
Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE, SAROKIN, and GIBSON,* Circuit Judges.
The petition for rehearing filed by Appellee, having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges in active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is DENIED.

. In the quotations from the warrant that appear below, the printed text is in regular type, and the typewritten text is underlined.

. The Fourth Amendment, of course, provides that warrants shall not be issued unless “supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized” (emphasis added).

. I do not reach — and I do not read the majority opinion as reaching — the qualified immunity defense pled in Armstrong's answer. See App. at 29; Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The district court did not base its award of summary judgment on this ground, and Armstrong did not raise this issue on appeal as an alternative ground for affirmance. The majority has not addressed this issue, and accordingly, any consideration of this issue will have to await further proceedings.

.Although the majority hints, see Maj. typescript at 1194 n. 5, that it likes the law of some other circuits better than our own, the majority fails to show how the claims at issue here could survive summary judgment under the precedents it cites. The majority states that other circuits, rather than demanding "actual knowledge,” have held that "reckless disregard on the part of a supervisor will suffice.” Id. (quoting Hall v. Lombardi, 996 F.2d 954, 961 (8th Cir.1993)). However, the majority makes no effort to demonstrate that there is sufficient evidence in the summary judgment record to establish that Armstrong was reckless in failing to recognize that the other officers were acting unlawfully and, as I attempt to show below, Dissenting typescript at 1201-02, I do not think that the summary judgment record contains such evidence.

. The search of Corey Baker would not necessarily have taken a long time, and therefore unless Armstrong happened to look into the bedroom where the search was allegedly taking place during that relatively brief period, he would not have seen the search.

. As previously noted, our precedents require "actual,” not constructive knowledge. In the discussion above, I do not suggest that constructive knowledge is sufficient. Rather, I argue that it would be manifestly unjust to hold a supervisor liable when he or she lacks even constructive knowledge.

. Since we are reviewing a grant of summary judgment, I agree with the majority that we must accept the Bakers’ statements that handcuffs and guns were employed. In addition, while I question (for reasons explained above in connection with the alleged search of Inez Baker’s purse) whether it is reasonable to infer that Armstrong saw what was done to the Bakers outside the apartment, I think that the record permits the inference that he saw that the Bakers were handcuffed when they were brought into the house and that he saw that a gun was pointed at Inez Baker while she was in the kitchen.

. Printed text is in regular type. Typewritten text is underlined. Handwritten text is italicized.